

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-20-2004

# Chen v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 03-3124

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Chen v. Atty Gen USA" (2004). *2004 Decisions.* Paper 361.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/361

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT
_____

No. 03-3124
_____

CAI LUAN CHEN,

Petitioner

v.

JOHN ASHCROFT, ATTORNEY
GENERAL OF THE UNITED STATES,

Respondent
_____

ON PETITION FOR REVIEW OF AN
ORDER OF THE BOARD OF
IMMIGRATION APPEALS
(No. A73 631 654)
_____

Argued: June 18, 2004

Before: ALITO, SMITH, and WALLACE,
Circuit Judges[*]

(Opinion Filed August 20, 2004)

_____

[*]The Honorable J. Clifford Wallace,
Circuit Judge for the United States Court
of Appeals for the Ninth Circuit, sitting by
designation.

THEODORE N. COX
JOSHUA BARDAVID (Argued)
401 Broadway, Suite 701
New York, New York 10013

*Counsel for Petitioner*

PETER D. KEISLER
DAVID V. BERNAL
JOCELYN L. WRIGHT (Argued)
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

*Counsel for Respondent*
_____

OPINION OF THE COURT
_____

ALITO, Circuit Judge:

Cai Luan Chen petitions for review
of an order of the Board of Immigration
Appeals (BIA) affirming the denial of his
application for asylum and withholding of
removal. Chen's primary argument is that
he is eligible for asylum based on his
fiancee's forced abortion at the hands of
Chinese government officials. In making
this argument, Chen relies on a decision of
the Board of Immigration Appeals holding
that the *spouse* of a person who was forced
to undergo an abortion or sterilization is
deemed under a 1996 amendment to 8
U.S.C. § 1101(a)(42) to have suffered past
persecution. Matter of C-Y-Z-, 21 I. & N.
Dec. 915 (BIA 1997) (en banc). Chen
argues that, while he and his fiancee were
never married, they *would have* married

had it not been for China's inflated minimum marriage age requirement, which was instituted as part of the country's oppressive population control program. Chen contends China's refusal to permit him to marry constituted persecution and that therefore the BIA's decision to limit C-Y-Z- to married persons is irrational and arbitrary and must be rejected.

We disagree. While limiting C-Y-Z- to married persons may produce undesirable results in some cases, the BIA's interpretation, which contributes to efficient administration and avoids difficult and problematic factual inquiries, is reasonable. We accordingly deny the petition for review.

## I.

Chen and his fiancee, Chen Gui, are both natives and citizens of the People's Republic of China. Chen and Chen Gui started living together at Chen's parents' house in July 1994. At the time, Chen was 19 and Chen Gui was 18.

In September 1995, the couple discovered that Chen Gui was pregnant, and they then applied for a marriage license at the local government office without disclosing the pregnancy. However, the office told them that their application could not be approved, since the legal age to marry was 25 for men and 23 for women.[1]

Government officials soon became aware of the pregnancy and told Chen Gui that the child would have to be aborted. Chen and Chen Gui delayed compliance with the order, and this prompted a group of local officials to visit the home of Chen's parents. Chen Gui, having been warned of the visit, was not there when the officials arrived, and Chen was accordingly asked to disclose Chen Gui's whereabouts. When Chen refused, the officials started hitting him with "sticks," and Chen fought back with a "plumbing tool." Finally, Chen's parents intervened to end the scuffle. The officials left, warning Chen that he would be arrested if Chen Gui did not report for an abortion in three days.

Chen and Chen Gui went into hiding, and Chen left the country shortly thereafter. He entered the United States in April 1996. About two months later, Chen contacted his family and was told that Chen Gui had ultimately been found and had been forced to submit to an abortion in

---

[1]We note that officially the minimum age for marriage in China appears to be 22 for men and 20 for women. See Marriage Law of the People's Republic of China, art. 6 (as amended April 28, 2001), available in LEXIS, Chinalawinfo Selected PRC Laws file at PRCLEG 1793. It is conceivable, however, that some local variation in these requirements may exist. See United States Department of State, China: Profile of Asylum Claims and Country Conditions (April 14, 1998) ("The minimum age for marriage in China is 22 for males and 20 for females. In some localities the ages are set higher."). For the purposes of this case, we assume the accuracy of Chen's description of the age requirement to which he was subject.

the eighth month of the pregnancy. Chen was also informed that Chen Gui was continuing to live with his parents.

The INS initiated removal proceedings against Chen, who subsequently sought asylum under the reasoning of the BIA's decision in C-Y-Z-. The IJ concluded that, although Chen and Chen Gui had never formally married, the case did "fall by analogy within C-Y-Z-, if not by the letter." App. II at 116. However, the BIA reversed on appeal, noting summarily that the decision in C-Y-Z- had "not been extended to include unmarried partners," App. I at 3, and that Chen's "own experiences with the authorities in China [did] not rise to the level of past persecution." Id. Chen then filed this petition for review.

## II.

The respondent in this case (hereinafter "the government") contends that the BIA's interpretation of 8 U.S.C. § 1101(a)(42) as covering the spouses but not the unmarried partners of persons who have been forced to undergo abortions or sterilization is entitled to deference under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44 (1984), and should be sustained. Chevron applies when "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." United States v. Mead Corp., 533 U.S. 218, 226-27 (2001). If Chevron applies, a court must ask (at what is customarily called step one) "whether Congress has directly spoken to the precise question at issue." Chevron, 467 U.S. at 842. "If so, courts, as well as the agency, 'must give effect to the unambiguously expressed intent of Congress.'" Household Credit Servs, Inc. v. Pfennig, 124 S. Ct. 1741, 1747 (2004) (quoting Chevron, 467 U.S. at 842-43). "However, whenever Congress has 'explicitly left a gap for the agency to fill,'" a court must proceed to step two, and "the agency's [interpretation] is 'given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute.'" Id. (second brackets in original) (quoting Chevron, 467 U.S. at 843-44). The Court has described this test as one of reasonableness. See Chevron, 467 U.S. at 845, 865, 866.

Here, there is no dispute that "the BIA should be accorded Chevron deference for its interpretations of the immigration laws," Tineo v. Ashcroft, 350 F.3d 382, 396 (3d Cir. 2003) (citing INS v. Aguirre-Aguirre, 526 U.S. 415, 424 (1999)), and Chen does not contend that 8 U.S.C. § 1101(a)(42) unambiguously covers the unmarried partners of persons who have undergone forced abortions or sterilization. Instead, Chen focuses on step two of the Chevron analysis and argues that the BIA's interpretation of 8 U.S.C. § § 1101(a)(42) is arbitrary, capricious, and irrational.

## III.

Before we can address Chen's argument regarding the limited scope that the BIA has given to its decision in C-Y-

Z- , it is helpful to review that decision and the statute on which it is based.

## A.

Under 8 U.S.C. § 1158(b)(1), the Attorney General may grant asylum to an alien who is a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42). In order to establish refugee status under the latter provision, an applicant must generally show that he or she "is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of [the country of such person's nationality or in which such person last habitually resided] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). By regulation, see 8 C.F.R. § 1208.13(b)(1), "[a] showing of past persecution gives rise to a rebuttable presumption of a well-founded fear of future persecution." Mulanga v. Ashcroft, 349 F.3d 123, 132 (3d Cir. 2003).

The BIA initially rejected the argument that "implementation of [China's] 'one couple, one child' policy in and of itself, even to the extent that involuntary sterilizations may occur, is persecution or creates a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Matter of Chang, 20 I. & N. Dec. 38, 44 (BIA 1989) (internal quotation marks and citation omitted). This holding, however, was superceded several years later by the Illegal Immigration Reform and Immigrant

Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009-546 ("IIRIRA"). Section 601 of the IIRIRA amended § 1101(a)(42) by adding the following language:

> [A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

Id. § 601, 110 Stat. at 3009-689; see also Matter of X-P-T-, 21 I. & N. Dec. 634 (BIA 1996) (en banc). (For convenience, we will refer to this new provision as "the 1996 amendment to § 1101(a)(42)" or simply "the 1996 amendment.")

The IIRIRA also imposed a cap of 1,000 persons per fiscal year on the number of aliens who may be granted asylum under the 1996 amendment. 8

4

U.S.C. § 1157(a)(5).[2] Accordingly, aliens found eligible for asylum under this provision are approved only conditionally, subject to an administrative determination that a final grant of asylum would not push the annual total above the statutory cap. See X-P-T-, 21 I. & N. Dec. at 637. Because the number of conditional grants issued per year has exceeded 1,000 for some time, the waiting list now includes more than 7,000 applicants. See News Release, U.S. Department of Justice, EOIR Notifies Persons Eligible for Full Asylum Benefits for Fiscal Year 2003 Based on Coercive Population Control Policies (Sept. 30, 2003), at http://www.usdoj.gov/eoir/press/03/CPC AsylumRelease0903.pdf. This means that applicants awarded conditional asylum today face a waiting period of at least seven years before becoming eligible for the full benefits of asylum, including the ability to apply for lawful permanent resident status and to obtain the admission to the United States of family members not included in the original asylum application. See id.; U.S. Citizenship and Immigration Services, Resistance To Coercive Population Control (CPC) Programs (Oct. 30, 2003), at http://uscis.gov/graphics/services/asylum

---

[2]The statute provides: "For any fiscal year, not more than a total of 1,000 refugees may be . . . granted asylum . . . pursuant to a determination under the third sentence of section 101(a)(42) (relating to persecution for resistance to coercive population control methods)." 8 U.S.C. § 1157(a)(5).

/cpc.htm.

## B.

In C-Y-Z-, the BIA, sitting en banc, considered the asylum petition of a man who claimed that his wife had been forcibly sterilized. The government conceded that the man was a victim of past persecution as defined by the 1996 amendment to § 1101(a)(42), asserting that "past persecution of one spouse can be established by coerced abortion or sterilization of the other spouse." C-Y-Z-, 21 I. & N. Dec. at 917; see also id. at 919 (noting agreement on the proposition that "forced sterilization of one spouse . . . is an act of persecution against the other spouse"). The BIA accepted this proposition, but unfortunately, it did not explain the basis for this conclusion. However, two rationales seem possible.

The first would proceed on the assumption that the persecution of one spouse by means of a forced abortion or sterilization causes the other spouse to experience intense sympathetic suffering that rises to the level of persecution. Cf. Abay v. Ashcroft, 368 F.3d 634, 642 (6th Cir. 2004) (suggesting that "mental suffering" resulting from "being forced to witness the pain and suffering of [a] daughter" constitutes persecution) (citing Matter of Dibba, No. A73 541 857 (BIA Nov. 23, 2001)). There is some evidence that this rationale may represent the BIA's thinking in C-Y-Z-. Board Member Rosenberg explained:

> It is not . . . unusual . . . that the applicant should be granted asylum although the

harm experienced was not by him, but by a family member. . . . It . . . constitutes persecution for the asylum applicant to witness or experience the persecution of family members . . . .

C-Y-Z-, 21 I. & N. Dec. at 926 (Rosenberg, Board Member, concurring).[3] This interpretation would presumably look to the language in the 1996 amendment that refers to persons who are "persecuted for . . . other resistance to a coercive population control program." See id. at 928 (Filppu, Board Member, concurring in part and dissenting in part) (explicitly noting the possibility that the majority holding rested on the "persecuted for . . . other resistance" clause). The suffering felt by the spouse who did not personally undergo the procedure would constitute the "persecut[ion]" to which this language refers, and the other spouse would be deemed to have "resist[ed]" the "coercive population control program," presumably on the assumption that he or she opposed the procedure.

This interpretation, however, is not without difficulties. For example, it is not clear why every spouse of a person who undergoes a forced abortion or sterilization should be deemed to have "resist[ed]" the "coercive population control program." What if the spouse who did not personally undergo the procedure sided with the government and favored the abortion or sterilization?

The second possible rationale for the C-Y-Z- decision is that performing a forced abortion or sterilization procedure on one spouse constitutes persecution of the other spouse because of the impact on the latter's ability to reproduce and raise children. The Ninth Circuit has suggested this interpretation, stating in Lin v. Ashcroft, 356 F.3d 1027, 1041 (9th Cir. 2004), that the forced sterilization of a wife could be "imputed" to her husband, "whose reproductive opportunities the law considers to be bound up with those of his wife." See also C-Y-Z-, 21 I. & N. Dec. at 918 ("[T]he husband of a sterilized wife can essentially stand in her shoes and make a bona fide and non-frivolous application for asylum based on problems impacting more intimately on her than on him."); see also id. at 921 n.2 (Rosenberg, Board Member, concurring) (citing international law regarding "right to procreate" and "right to . . . found a family"); Matter of Y-T-L-, 23 I. & N. Dec. 601 (BIA 2003) (en banc) (Pauley, Board Member, dissenting) ("I understand our ruling in Matter of C-Y-Z- to be based on the theory that the persecution of one spouse by forced sterilization is imputed to the other"). It takes some effort to reconcile this interpretation with the language of the 1996 amendment, since

---

[3]The Sixth Circuit in Abay appeared to agree that the implication of Board Member Rosenberg's concurring opinion in C-Y-Z- was that a "family member may be eligible for asylum based upon the physical harm inflicted upon another family member." See Abay, 368 F.3d at 641.

the phrase "a person who has been forced to abort a pregnancy or to undergo involuntary sterilization" is most naturally read as referring only to a person who has personally undergone one of those procedures. But perhaps it could be argued that the loss of opportunity to have and raise children also constitutes "persecut[ion] for . . . other resistence to a coercive population control program."[4]

In this case, however, it is not necessary for us to decide whether C-Y-Z- 's interpretation of the 1996 amendment is permissible. If it is not and the 1996 amendment applies only to persons on whom a forced abortion or sterilization procedure has actually been performed, Chen obviously cannot prevail. On the other hand, if C-Y-Z-'s interpretation is permissible (and we assume for the sake of argument that it is), the distinction that the BIA has drawn between married and unmarried couples satisfies step two of Chevron.

**IV.**

With the possible bases of the C-Y-Z- decision in mind, we turn to Chen's argument that the BIA's interpretation of the 1996 amendment, by drawing a distinction between married and unmarried couples, "evinces such a lack of rationality as to be arbitrary and capricious."

---

[4]In the case of a forced abortion, conception in violation of the program could constitute the "resistance," and since involuntary sterilization often follows prohibited conception, this same theory might work in that context as well.

Petitioner Br. at 16-17 (quoting Zhao v. United States DOJ, 265 F.3d 83, 95 (2d Cir. 2001)).[5]

**A.**

As we understand it, C-Y-Z- uses marital status as a rough way of identifying a class of persons whose opportunities for reproduction and child-rearing were seriously impaired or who suffered serious emotional injury as the result of the performance of a forced abortion or sterilization on another person. Of course, this use of marital status as a proxy is undoubtedly both over- and under-inclusive to some extent, but neither over- nor under-inclusiveness is alone sufficient to render the use of a metric like marital status irrational. See Heller v. Doe, 509 U.S. 312, 321 (1993) (citation omitted) ("A classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.'"); Dandridge v. Williams, 397 U.S. 471, 485 (1970); Lofton v. Sec'y of the Dep't of Children & Family Servs., 358 F.3d 804, 822-23 (11th Cir. 2004) ("The Supreme Court repeatedly has instructed that neither the fact that a classification may be overinclusive or underinclusive nor the

---

[5]While this argument bears some similarity to a rational-basis Equal Protection Clause argument, it is clear that Chen is not attempting to make a constitutional argument here. Nor does Chen contend that any standard of review more stringent than "rationality" ought to apply.

7

fact that a generalization underlying a classification is subject to exceptions renders the classification irrational.").[6]

This principle is well illustrated by cases involving immigration laws that attempt "to provide some – but not all – families with relief from various immigration restrictions that would otherwise hinder reunification of the family in this country." Fiallo v. Bell, 430 U.S. 787, 797 (1977). For example, in Fiallo, the Supreme Court upheld the constitutionality of provisions that excluded illegitimate children and their fathers (but not illegitmate children and their mothers) from special preference immigration status. The Court acknowledged that these provisions could have the effect of "deny[ing] preferential status to parents and children who share strong ties," id. at 798, and the Court noted the argument that "the statutory distinction [was] based on an overbroad and outdated stereotype concerning the relationship of unwed fathers and their illegitimate children," id. at 799 n.9. Nevertheless, the Court concluded that the statutory

distinction could be viewed as serving two purposes: (1) providing a convenient way to weed out cases in which "close family ties" were lacking and (2) avoiding "problems of proof and the potential for fraudulent visa applications." Id. at 798, 799 n.8; see also Nguyen v. INS, 533 U.S. 53, 62 (2001) (finding need for reliable evidentiary verification "that a biological parent-child relationship exists" to be an important government interest justifying disparate treatment of illegitimate children born to citizen mothers and those born to citizen fathers). Likewise, a law requiring aliens who married United States citizens while in removal proceedings to wait outside the country for two years before qualifying as I-130 "immediate relatives" has been found to be rational as a method of deterring sham marriages. Almario v. INS, 872 F.2d 147, 152 (6th Cir. 1989); Anetekhai v. INS, 876 F.2d 1218, 1222 (5th Cir. 1989) ("Congress logically could have concluded that aliens who are engaged in deportation proceedings are more likely than aliens not so situated to enter into fraudulent marriages as a means of avoiding expulsion from the United States.").[7]

---

[6]Indeed, the marriage relation is used in so many areas of the law (income tax, welfare benefits, property, inheritance, testimonial privilege, etc.) that it would seem absurd to characterize reliance on marital status in C-Y-Z- as arbitrary and capricious. Cf. Montgomery v. Carr, 101 F.3d 1117 (6th Cir. 1996) (deeming rational the enforcement of a school anti-nepotism policy against married couples but not cohabitants).

[7]The Supreme Court has reversed at least one prior attempt by this Circuit to engage in more searching review of line-drawing exercises by the political branches of government in the area of immigration law. In INS v. Hector, 479 U.S. 85 (1986) (per curiam), the Supreme Court rejected a holding allowing for the possibility of treating nieces as "children" in a hardship

Similarly, we may say that the BIA "logically could have concluded that aliens who are [married] are more likely than aliens not so situated" to be severely injured in the ways noted above when their partners are forced to endure forced abortions or sterilization. Indeed, in light of the "crushing caseload" faced by the BIA in recent years, see Dia v. Ashcroft, 353 F.3d 228, 235 (3d Cir. 2003) (en banc), it was entirely rational for the Board to adopt a position requiring marriage, which can often be proven easily and reliably through objective documentary evidence such as marriage certificates or "household registration booklets." See, e.g., Zhao, 265 F.3d at 87; C-Y-Z-, 21 I. & N. Dec. at 916. By contrast, a rule extending C-Y-Z- to non-spouses would create numerous practical difficulties that the BIA might reasonably have chosen to avoid. For example, in cases in which a male applicant claims to have fathered an illegitimate child who was forcibly aborted by government officials, the problem of proving paternity would be even more acute than those presented in Fiallo and Nguyen. Moreover, the BIA might reasonably have decided that, *in general*,

forced abortions and sterilization procedures tend to have a more severe impact on spouses than on unmarried partners. The BIA might also have been concerned that unmarried asylum-seekers would falsely claim to have had an intimate relationship with a person who suffered a forced abortion or sterilization,[8] and the BIA might have felt that it would be too difficult to distinguish between those unmarried persons who had a truly close relationship with the person who underwent the medical procedure and those unmarried asylum seekers who did not.[9] Chen does not explain why the BIA

---

analysis if it could be shown that a "parental-type relationship" existed. See id. at 87. Whether any unfairness to the nieces in such "parental-type relationship[s]" may have resulted did not enter into the Court's calculus; all that mattered was that Congress, in defining "children," had not seen fit to include nieces raised as effective adoptees. See id. at 90-91.

---

[8] An analogy may be drawn here to the tort of negligent infliction of emotional harm. As explained in Restatement (Second) of Torts § 436, recovery under this tort may be available when members of the *immediate family* of a victim witness the infliction of harm. Id. § 436(3) (emphasis added). "However, where a stranger is involved . . . there may be sufficient uncertainty as to the genuineness or seriousness of the emotional disturbance to justify, as a matter of administrative policy, a denial of liability." Id. cmt. h. Here, the BIA may have concluded that, given the difficulty of determining the "genuineness" of emotional harm felt by one upon hearing of harm to his fiancee, the strict limitation of C-Y-Z- to married couples was justified "as a matter of administrative policy."

[9] That *some* applicants could conceivably be able to present such convincing evidence is beside the point.

was irrational in deciding on a bright-line rule for this class of cases, rather than submitting each individual claim to a detailed (and probably inconclusive) psychological analysis concerning the nature of a claimed relationship.

For these reasons, we conclude that the BIA's decision not to extend C-Y-Z- to unmarried partners satisfies step two of Chevron. The BIA's interest in promoting administrability and verifiability is sufficient to clear the low hurdle presented by the step two standard, especially in light of the limited number of spots allowed by Congress for asylum claims based on the 1996 amendment.[10]

---

We note that Fiallo did not require any special exception to be carved out for fathers who could prove actual paternity of illegitimate children when they had not adopted or legitimated them. Nor did Almario and Anetekhai provide those who married during removal proceedings an opportunity to present evidence showing that their marriages were not shams. Such rules, like the one adopted by the BIA here, represent pragmatic approaches that make it possible for an overburdened agency to do the work with which it is charged.

[10]The government offers an alternative explanation for the BIA's distinction between married and unmarried asylum applicants, noting that "[a] grant of asylum to an applicant present in the United States enables the asylee to have his or her spouse and children admitted to the United States as derivative beneficiaries of the

## B.

Chen argues, however, that even if it is rational not to extend C-Y-Z- to cover all unmarried partners, it is irrational to exclude him and other unmarried persons who *wanted* and indeed *tried* to get married but were prevented from doing so by a law that is

an integral part of a program of persecution. This argument must be rejected for reasons similar to those already discussed. Chen's situation simply shows that C-Y-Z- is underinclusive with respect to a narrow but sympathetic class, and as noted, a rule is not irrational just because it is underinclusive to some

---

asylee's status." Respondent Br. at 19. Because "the existence of a valid, legal marriage is required before an immigrant visa may be issued," the government concludes that the disparate treatment of married and unmarried applicants is "consistent with the statutory design and the family unification policies underlying the issuance of immigration visas." Id. This argument is not without some merit. However, given the current length of the conditional asylee waiting list, spouses granted conditional status under C-Y-Z- today must wait at least seven years before they can even *apply* for such a visa on behalf of their spouses. Accordingly, we doubt as a practical matter that the potential eligibilty for preferential visas actually operates to hasten the admittance to the United States of spouses directly persecuted under coercive population control programs.

extent.

Of course, if the Chinese authorities' refusal to permit Chen and Chen Gui to marry was itself an act of persecution, then Chen suffered past persecution. But although minimum marriage ages of 23 and 25 are contrary to our traditions and international practice, we cannot go so far as to say that enforcement of these laws necessarily amounts to persecution.

American constitutional law recognizes marriage as a fundamental right, see Loving v. Virginia, 388 U.S. 1 (1967), but all states impose minimum marriage age requirements,[11] and we assume that these laws are constitutional. See Moe v. Dinkins, 669 F.2d 67, 68 (2d Cir. 1982) (per curiam) (law requiring parental consent for marriage of individuals under 18 deemed constitutional, as a rational means for helping "prevent[] unstable marriages among those lacking the capacity to act in their own best interests"); Maynard v. Hill, 125 U.S. 190, 205 (1888) (state legislature may prescribe "the age at which parties may contract to marry"); see also Zablocki v. Redhail, 434 U.S. 374, 386 (1978) ("[R]easonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed."); cf. Zablocki, 434 U.S. at 392 (Stewart, J., concurring) ("A State may not only 'significantly interfere with decisions to enter into the marital relationship,' but may in many circumstances absolutely prohibit it.") (footnote and citation omitted). Laws setting reasonable minimum marriage ages are also recognized as legitimate and desirable under international human rights law.[12]

It is certainly true that marriage laws in this country set the minimum age for marriage considerably below 23 or 25. Almost all states set 18 as the minimum age to marry without parental consent.[13] Where parental consent is provided, as it apparently was in the case now before us, most states permit marriage at the age of

---

[11]See Legal Information Institute, Cornell Law School, Marriage Laws of the Fifty States, District of Columbia and Puerto Rico, at http://www.law.cornell.edu/topics/Table_Marriage.htm (citing age requirements and pertinent statutes) (hereinafter Marriage Laws of the Fifty States).

[12]See Convention on Consent to Marriage, Minimum Age for Marriage and Registration of Marriages, Dec. 9, 1964, art. 2, 521 U.N.T.S. 231, 234, at http://untreaty.un.org/English/access.asp ("States parties to the present Convention shall take legislative action to specify a minimum age for marriage."). We note, however, that the apparent purpose of the Convention's minimum age requirement (as stated in the preamble) is not population control, but rather the elimination of child marriages and the "betrothal of young girls before the age of puberty." Id. pmbl., 521 U.N.T.S. at 232.

[13]See Marriage Laws of the Fifty States, supra note 11.

16.[14] It is also true that the marriage laws of other countries generally set the minimum marriage age at 18 years or less, and it appears probable that no other country sets the minimum as high as does China.[15]

A law or practice, however, does not necessarily rise to the level of "persecution" simply because it does not satisfy American constitutional standards or diverges from the pattern followed by other countries. As we have noted, persecution is an "extreme" concept that "does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional." Fatin v. INS, 12 F.3d 1233, 1240 & n.10 (3d Cir. 1993).

Here, we cannot say that the BIA was bound to conclude that minimums of 23 and 25 amounted to persecution. Chen and Chen Gui were not permanently barred from marrying, and marriage at the minimum ages in question would not have precluded them from having a long life together or from raising children. See Li v. Ashcroft, 356 F.3d 1153, 1164 (9th Cir. 2004) (en banc) (Kleinfeld, J., dissenting) ("[T]he higher marriage age does not necessarily restrain people from having the number of children they want. . . . People can . . . still have 2, or 3, or 10 children, if their individual biology and preferences lead them to do so and the government does not forcibly abort their children or sterilize them."). It is perhaps worth noting that the median ages of first marriages for men and women in this country now exceed the minimum age requirements that Chen contends amount to persecution.[16] Although defining the outer boundaries of the concept of "persecution" is hard, we cannot say that requiring a person to wait until reaching the age of 23 or 25 is so far outside the accepted realm of human decency as to constitute persecution.

## C.

We acknowledge that our reasoning may appear to be in tension with that of Ma v. Ashcroft, 361 F.3d 553 (9th Cir. 2004). In that case, the petitioner Ma and his partner were married in a "traditional" Chinese ceremony in their village. Because Ma was underage, the marriage could not be officially registered with the Chinese government. Ma's partner conceived two months later and went into hiding to avoid detection by the authorities. Ultimately, however, she was found and forced to undergo an abortion, and the couple was fined for "early"

---

[14]Id.

[15]Angela Melchiorre, Right to Education Project, At what age? 15-21 (2d ed. 2004) (listing marriage age requirements 156 countries). A few countries, including Algeria, Cambodia, India, Indonesia, Togo, and Vietnam, set age requirements above 18 years. Id.

---

[16]See United States Census Bureau, Statistical Abstract of the United States 60 (123d ed. 2003) (noting that 85.4% of males and 74.0% of females under the age of 25 in the United States have never been married).

pregnancy and marriage. Ma subsequently fled to the United States. When he attempted to apply for asylum under C-Y-Z-, the BIA rejected his claim on the ground that he was not legally married under Chinese law. By this time, however, Ma had actually reached the legal age to marry in China. He therefore applied for and obtained a certificate from the Chinese government indicating that his marriage was considered valid, and he submitted this certificate to the BIA with a motion to reconsider, which the BIA ultimately denied. Ma petitioned for review, and the Ninth Circuit reversed, holding that C-Y-Z-'s interpretation of § 1101(a)(42) could not rationally be limited to exclude "*husbands* whose marriages would be legally recognized, but for China's coercive family planning policies." Ma, 361 F.3d at 561 (emphasis added).

Because Ma's marriage had been recognized by the Chinese government by the time of the BIA's decision, it was unnecessary for the Ninth Circuit to reach the question whether the BIA can reasonably refuse to extend C-Y-Z- to cases involving persons whom the Chinese authorities refuse to recognize as married. But assuming that the holding in Ma reaches all persons married in traditional ceremonies that the Chinese government does not sanction, Chen would still not qualify, since he does not claim that he and Chen Gui ever formalized their relationship in that way. Indeed, Chen has never argued that he is actually married in any sense, and in fact he affirmed precisely the opposite in his asylum application. See App. II at 265 (checking box labeled "not

married"). Because Ma's express holding applies only to putative husbands and not unmarried partners, it is inapposite here.[17]

Nevertheless, we acknowledge that Ma's reasoning could be applied to someone in Chen's shoes. The Ma court reasoned that it is "absurd and wholly unacceptable" to deny asylum to a person based solely on a consequence of a population control policy expressly "deemed by Congress to be oppressive and persecutory." Ma, 361 F.3d at 559. According to Ma, this would "contravene[] the purpose and policies of the [IIRIRA] statutory amendment." Id. at 560. In other words, the Ma Court concluded that the BIA's interpretation of § 1101(a)(42) failed step two of Chevron because it was clearly contrary to Congress's intent, or, as the Ma Court put it, Congress's "purpose and policies." Id. We must disagree with this analysis because we see no basis for concluding that Congress's intent in

<hr/>

[17]See, e.g., Ma, 361 F.3d at 559 ("The question presented here is whether *husbands*, whose marriages are denied recognition by virtue of the population control program that Congress has condemned, may be deprived of eligibility for asylum on the basis of that denial.") (emphasis added); id. at 560 ("BIA's decision to limit asylum eligibility so as to exclude *husbands* . . . contravenes the purpose and policies of the statutory amendment.") (emphasis added); id. at 561 ("Application of the BIA's rule would result in the separation of a *husband* and wife . . . .") (emphasis added).

amending § 1101(a)(42) was to afford relief to *every* person who is a victim of *any* rule or practice that forms a part of the Chinese population control program.

"The starting point in discerning congressional intent is the existing statutory text . . . ." Lamie v. United States Tr., 124 S. Ct. 1023, 1033 (2004). The language of the 1996 amendment to § 1101(a)(42) has several indications of intent that we think are unmistakable. The first is that proof of "persecution" or "well-founded fear of persecution" is absolutely required to make a successful claim for asylum, just as was the case prior to the amendment. The second point is that, with the exception of forced abortions and sterilizations, the concept of "persecution" is left completely undefined. We infer from Congress's use of this ambiguous term an intent to delegate interpretive authority to the agency, including the ability to decide, within a reasonable range, the precise contours of its meaning. FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 159 (2000) ("Deference under Chevron to an agency's construction of a statute that it administers is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps.").[18] Third, the imposition of a yearly cap clearly reveals an intent to carefully limit the scope of relief made available by the amendment.

Against this background, it is hard to see how Ma could have concluded that a rule limiting C-Y-Z- to married couples was contrary to Congress's intent. If Ma meant to say that individuals who suffer under a coercive population program may be eligible for asylum even if their suffering (or feared suffering) is not proved or presumed to rise to the level of persecution, we emphatically disagree.[19] As we have explained, the asylum statute plainly limits relief to cases involving "persecution." That scheme necessarily excludes cases involving lesser harms, even when those harms implicate to some degree the humanitarian interests that animated passage of the asylum statute.[20]

---

Aguirre-Aguirre, 526 U.S. at 425.

[19] We note that the opinion in Ma never explicitly finds or assumes that the petitioner had actually suffered persecution.

[20] For example, the statute extends relief to those who are persecuted "on account of race." 8 U.S.C. § 1101(42). The primary purpose of that provision is no doubt to extend aid to certain individuals who suffer the effects of gross racial inequality in their countries of origin. Yet courts routinely deny relief to those who suffer racial discrimination that falls short of "persecution," see, e.g., Nagoulko v. INS, 333 F.3d 1012, 1016-17 (9th Cir. 2003), even though it might be said that such

---

[18] There is no question that Congress has delegated authority to the BIA generally to "make rules carrying the force of law," cf. Mead, 533 U.S. at 226-27, and that its interpretations of ambiguous statutory terms are entitled to Chevron deference.

14

Alternatively, it may be that <u>Ma</u>'s position was that the BIA's interpretation of the term "persecution" fell outside the acceptable range of meanings within which Congress authorized the agency to choose. However, there is no indication that Congress intended to put limits on the meaning of the term "persecution" beyond those imposed by the normal understanding of the word. <u>Matter of Acosta</u>, 19 I. & N. Dec. 211, at 223 (BIA 1985). ("Congress chose not to define the word 'persecution' . . . because the meaning of the word was understood to be well established by administrative and court precedents."). Of course, with the 1996 amendment, Congress did add the constraint that "persecution" could not be interpreted in a way that would exclude involuntary sterilizations or abortions. But this merely shows that Congress knew how to be very specific regarding what constituted persecution when it wanted to. Furthermore, we find it highly unlikely that Congress could have intended to dramatically broaden the notion of "persecution" with respect to persons suffering under coercive population programs while contemporaneously imposing a yearly cap strictly circumscribing the relief available to them.

An examination of the relevant legislative history only confirms our understanding of Congress's intent. We cannot locate any evidence that the

legislators who considered the amendment to § 1101(a)(42) thought that persons such as Chen would qualify thereunder.[21] To the contrary, it seems that some legislators had reservations about the ease with which "young Chinese single-unmarried-males" might falsely claim eligibility for asylum under the proposed amendment, resulting in a flood of meritless applications. 142 Cong. Rec. S4593 (daily ed. May 2, 1996) (statement of Sen. Simpson). Statements from others suggest that the reference to "persecut[ion]" in the amendment was simply intended to include actions such as "torture" and "sexual abuse" that would qualify as persecution under the prevailing definition of the term. <u>See</u> 142 Cong. Rec. H2634 (daily ed. Mar. 21, 2996) (statement of Rep. Smith).[22]

At a more general level, we note that some members of Congress have in the past actually considered—and

---

[21]There is at least one statement in the Congressional Record which speaks disparagingly of China's "marriage bans," but that statement is made in reference to permanent restrictions on marriage motivated by a desire to "avoid new births of inferior quality," and not the sort of age-based restrictions at issue in this case. <u>See</u> 140 Cong. Rec. S327-28 (daily ed. Jan. 28, 1994) (statement of Sen. Helms).

[22]In such cases, the amendment would serve to clarify that such actions, if taken in response to resistance to a coercive population control program, should be deemed inflicted "on account of political opinion."

---

denials disserve Congress's broader policy of providing relief to victims of racial injustice.

15

rejected—the possibility of providing an explicit definition for "persecution" in connection with another portion of the INA.  It was reasoned that

> any such definition would necessarily limit application of the provision to particular, presently foreseeable situations.  Persecution, however, has and will continue to take many forms and it is the intention of the committee in recommending this legislation to allow the maximum amount of flexibility possible in its administration.  The inclusion of a necessarily limited and rigid definition would be inconsistent with such an intent.

H.R. Rep. 95-1452, at 6-7 (1978), reprinted in 1978 U.S.C.C.A.N. 4700, 4705-06; cf. INS v. Cardoza-Fonseca, 480 U.S. 421, 449 (1987) ("In enacting the Refugee Act of 1980 Congress sought to give the United States sufficient flexibility to respond to situations involving political or religious dissidents and detainees throughout the world.") (internal quotation omitted).

To be sure, we assume that the members of Congress who voted in favor of the 1996 amendment to § 1101(a)(42) considered the Chinese population control program as a whole to be objectionable and that they found fault with many specific features of the program.

However, the 1996 amendment to § 1101(a)(42) is limited in scope.  Under that amendment, the worst effects of the Chinese program – forced abortions and involuntary sterilization – are deemed to constitute "persecution," but the amendment does not provide similar treatment for other adverse effects of the program, such as, to take one example, dismissal from employment for failure to abide by the one-child policy.[23]  Even though a person who is fired for violating the policy is a victim of the objectionable Chinese program, such a person cannot prove past persecution simply by establishing the occurrence of and the reason for the dismissal.[24]  It is apparent,

---

[23]See United States Dep't of State, Country Report on Human Rights Practices—2002: China (2003) (noting China's reliance on "education, propaganda, and economic incentives, as well as on more coercive measures such as the threat of job loss or demotion and social compensation fees").

[24]Under the 1996 amendment the reason for the dismissal (failure to comply with the one-child policy) might well qualify as "resistance to a coercive population control program," but the person who was fired would still have to show that dismissal was severe enough to amount to persecution.  While we express no opinion on this point, we reiterate that "persecution" is an extreme concept that "does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional."  Fatin, 12

therefore, that it was not Congress's intent to provide relief for every victim of any feature of the Chinese program. Rather, Congress obviously had the more modest purpose of providing relief for a much more limited class. Especially in light of the rather low yearly cap on the number of asylum applications that may be granted under the 1996 amendment, the BIA's refusal to extend C-Y-Z- may be viewed as furthering this congressional goal.

## V.

A few remaining issues must be addressed. First, Chen suggests that the beatings he suffered at the hands of government officials combine with the forced abortion and the marriage license denial in such a way as to constitute past persecution. They do not. Chen's scuffle with the local officials does not appear to have been serious. For example, the government points out that Chen has never alleged that this altercation resulted in any injuries that required medical treatment. Respondent Br. at 24. Physical abuse similar to this has been held to not constitute persecution. See, e.g., Prasad v. INS, 47 F.3d 336, 339 (9th Cir. 1995) (no past persecution where petitioner was arrested, hit, kicked, and detained for four to six hours). The BIA found that Chen's experiences with the authorities in China did not rise to the level of persecution, and we cannot say that "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

Chen further argues that, even if he did not suffer persecution in the past, he still has a well-founded fear that he would suffer future persecution if he returned to China. He points to several cases and secondary sources generally describing incidents of harsh treatment that Chinese prison officials have inflicted upon political prisoners, including refugees returned to China. See Petitioner Br. at 20-22. This generalized evidence presented by Chen, however, by no means compels the conclusion that the BIA erred in determining that he had not "established a well-founded fear of persecution." App. I at 3; 8 U.S.C. § 1252(b)(4)(B).

Finally, Chen does not appear to have challenged the rejection of his claim for withholding of removal in the brief accompanying his petition for review. Accordingly, the claim has been waived. See FDIC v. Deglau, 207 F.3d 153, 169-70 (3d Cir. 2000); Ma, 361 F.3d at 557 n.5; Qin v. Ashcroft, 360 F.3d 302, 305 n.5 (1st Cir. 2004).

## VI.

In sum, assuming that C-Y-Z- permissibly applied the 1996 amendment to spouses, we hold that the BIA's decision not to extend C-Y-Z- to unmarried partners is reasonable and therefore, under step two of Chevron, is entitled to controlling weight. We defer to this interpretation and deny the petition for review.

---

F.3d at 1240 & n.10.