[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 8, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-15742
Non-Argument Calendar

_____

Agency No. A77-977-849

YI QIANG YANG,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(August 8, 2007)**

Before BLACK, CARNES and MARCUS, Circuit Judges.

PER CURIAM:

The Court, on its own motion, grants rehearing and substitutes this opinion

for the one we issued earlier this month.  See Yang v. United States Attorney

General, ___ F.3d ___, 2007 WL 2000044 (11th Cir. July 12, 2007).

Yi Qiang Yang, a native and citizen of China, entered the United States illegally on September 28, 2001. While he was detained at the airport, immigration officials conducted an entrance interview. They asked Yang why he came to the United States. He said that he came because America was "better [than] China" and "the greatest country in the world," and he wanted "to earn a living." Yang was then asked whether he had any reason to fear returning to China. He said that he might be put in jail for not having a passport, but that he would not be harmed. However, Yang continued, he "really [did not] want to go back to China." When asked for his marital status, Yang said he was "single."

Yang was charged with removal for, among other things, failing to possess a valid entry document at the time he sought admission into the country, in violation of 8 U.S.C. § 1182(a)(7)(A)(i)(I). Yang conceded that he was removable based on this charge. He also applied for asylum, withholding of removal, and relief under the Convention Against Torture.

At his asylum hearing, Yang testified that he and Jiang Hui Ling had a "traditional marriage ceremony" with friends and family on July 15, 2000. They could not be formally married, according to Yang, because under Chinese law they were under the legal age—Yang was 20 and Ling was 17.

The couple discovered that Ling was pregnant in February 2001. Because

2

they were not legally married, Yang said, the Chinese government would force Ling to have an abortion if it discovered that she was pregnant. To avoid detection, Yang and Ling hid at Yang's grandmother's house.

The government found out anyway. On July 3, 2001, family planning officials took Ling to the hospital to have an abortion. When Yang discovered that Ling was missing, he went to the hospital to free her. Once there, five government officials began to beat Yang, but, according to him, he grabbed a broom, beat the officials off of him, and escaped.

Yang did not return to his home because the family planning officials were waiting for him there; the next day they sent a subpoena ordering that Yang come to the local security office. Yang later heard that Ling had been forced to abort the baby. He left China on September 25, 2001.

In addition to his testimony, Yang submitted corroborating evidence in support of his asylum petition. Among the exhibits introduced at the asylum hearing, Yang offered: (1) the State Department's country report on China; (2) a note from Lianjiang hospital, dated July 3, 2001, stating that Ling had an induced abortion; (3) a subpoena from the local security office, dated July 4, 2001, summoning Yang to its office the next day; (4) a receipt, dated July 2, 2000, for two wedding rings paid for by Yang; and (5) a letter from Yang's uncle stating that he attended Yang's "traditional wedding" on July 15, 2000, Yang and Ling were

3

married by traditional means because "early marriage is forbidden," and when Ling was forcibly taken by family planning officials to have an abortion, Yang "tried to save his wife and fought with the officials."

Yang's exhibits also included an affidavit and a letter from Ling. The affidavit, dated March 10, 2005, stated that she and Yang "held a wedding according to the old traditional custom on July 15, 2000 . . . and started to live together without going through the marriage registration formalities." The letter, dated January 7, 2003, gave the following account of her marriage, pregnancy and abortion:

> Dear Husband, do you still remember our wedding on July 15, 2000? Sometime after our marriage, in around February 2001, I did not feel good and went to see a doctor. It was then we found out I would give birth to our child . . . . But since China has a very strict checking system on Family Planning, we women have to have physical check up every three-month. On July 3rd, Mom called us and said she was very sick. We were very worry and afraid something might happen, so we rushed back to visit her. After you found out she was really sick, you sent her to the hospital immediately and left me home alone. At around 2 p.m. in the afternoon there came seven people. They claimed they were from the Family Planning Office and tried to take me away forcefully. Even though I tried to struggle and begged for their mercy, they would not bother to care. They took me to Lianjiang County Hospital and locked me up in a room. A moment later two nurses came inside. One of the nurses who had a syringe in her hand gave me a shot in my abdomen. After a few minutes, I had a very sharp pain in that area. And after my baby came out of my body, I saw the nurses put the poor baby in a plastic bag. I was so shock that I passed out. After I regain my consciousness, my mother told me that you tried to save me and fought with the officials of the Family Planning Office. The Cadres of the Family Planning Unit were

4

looking for you and tried to arrest you.

The immigration judge found that Yang was not entitled to asylum because he had not established that he was subject to past persecution or that he had a well-founded fear of future persecution. The IJ acknowledged that in Matter of C-Y-Z- the Board of Immigration Appeals held "that an alien who's [sic] spouse was forced to undergo an abortion or sterilization procedure can establish past persecution on account of political opinion as a refugee within the definition of that word under Section 101(a)(42) of the Immigration and Nationality Act." But the IJ found that Yang had "failed first of all to prove that he and this person he describes as his wife entered into a traditional marriage in [his] country of China."

The IJ also found that Yang had "failed to present anything to the Court to show that traditional marriages are legal in China and recognized by the government of China." And, the IJ found that in Yang's "own mind he is single. That's why he answered the question regarding his marital status as being single."

The IJ concluded that Yang had "failed to establish [] a spousal relationship between him and the person he described or referred to as his wife throughout his application." Therefore,

> even if the Court were to conclude that [Yang] was able to prove that the person he refers to as his wife was forced to undergo abortion he cannot benefit from that. The reason is that he failed to show that they were legally married and the decision in the Matter of C-Y-Z-, applies only where a spousal relationship has been established between the

5

respondent and the spouse. The Court concludes that the Board of Immigration Appeals in the Matter of C-Y-Z-, does not apply in [Yang]'s case.

The IJ also concluded as an alternative ground for denying Yang's petition that the encounter with family planning officials he described was not sufficiently serious to constitute persecution. As to any well-founded fear of future persecution, the IJ found Yang's testimony to be not credible, and therefore, according to the IJ, Yang had not presented sufficient evidence that "anyone in China is looking for him on account of a protected ground."

Because Yang had not meet his burden as to asylum, the IJ concluded that he could not meet the higher burden for establishing entitlement to withholding of removal. And as to Yang's CAT claim, the IJ concluded that Yang had "failed to establish that he was tortured in his country or that it is more likely than not that he would be tortured if he were to return to his country."

The BIA dismissed Yang's appeal of the IJ's decision. The BIA agreed with the IJ that "an applicant must have entered into a legally recognizable marriage in order to be considered a spouse within the meaning of Matter of C-Y-Z-.," and "[u]nderage couples living in de facto unregistered relationships are not recognized as married by the Chinese government."

The BIA also concluded that Yang was not entitled to relief based on his own independent opposition to China's population control program. The BIA

6

agreed with the IJ that Yang was not credible given the inconsistencies between his initial airport interview and his asylum application. Therefore, the BIA concluded that Yang's testimony regarding his confrontation with the family planning officials was to be disregarded.

Yang petitions for review of the BIA's decision on his asylum and withholding of removal claims.[1] He contends that: (1) the BIA's disparate treatment of lawfully married couples from traditionally married couples is a violation of the Equal Protection Clause; (2) the BIA's adverse credibility finding is not supported by the record; (3) the BIA's decision that Yang and Ling's marriage was not a spousal relationship was an unreasonable interpretation of the refugee statute, 8 U.S.C. § 1101(a)(42), and the C-Y-Z- decision; and (4) the BIA's conclusion that Yang had not been persecuted for resisting China's coercive population control program was not supported by the record.

The Secretary of Homeland Security or the Attorney General may grant asylum to an alien in this country if he meets the definition of "refugee." 8 U.S.C. § 1158(b)(1). A "refugee" is

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or

---

[1] Yang has not sought review of the BIA's decision to deny him relief under the CAT. He has therefore abandoned that issue here. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005).

7

unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

Id. § 1101(a)(42). "[A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion . . . ." Id.

The BIA's factual determinations are reviewed under the substantial evidence test, and we must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole. Al Najjar v. Aschroft, 257 F.3d 1262, 1283–84 (11th Cir. 2001). The substantial evidence test is deferential and does not allow us to re-weigh the evidence from scratch. Mazariegos v. Office of U.S. Att'y Gen., 241 F.3d 1320, 1323 (11th Cir. 2001). The BIA's "decision can be reversed only if the evidence 'compels' a reasonable fact finder to find otherwise." Sepulveda, 401 F.3d at 1230.

Yang first argues that BIA's disparate treatment of legally married couples from traditionally married couples violated the Equal Protection Clause. We cannot reach the merits of Yang's equal protection argument because he failed to

8

exhaust his administrative remedies by raising it before the BIA.  Amaya-Artunduaga v. U.S. Att'y Gen., 463 F.3d 1247, 1250 (11th Cir. 2006) (petitioner failed to exhaust his administrative remedies where he did not raise argument in notice of appeal or brief before the BIA).  Accordingly, we lack jurisdiction to consider the argument now.  Id. (the Court "lack[s] jurisdiction to consider a claim raised in a petition for review unless the petitioner exhausted his administrative remedies with respect thereto"); see also 8 U.S.C. § 1252(d) ("A court may review a final order of removal only if the alien has exhausted all administrative remedies available to the alien as of right . . . .").  We will therefore dismiss this part of Yang's petition.

Yang's second contention is that the BIA's adverse credibility finding is not supported by the record.  Specifically, Yang argues that inconsistencies between his initial interview at the airport and his later statements do not necessarily suggest, as the BIA concluded, that his later statements are not credible.  Indeed, three of our sister circuits have held that an airport interview should only be used against an alien where the interview meets certain indicia of reliability.  See Balogun v. Ashcroft, 374 F.3d 492, 504 (7th Cir. 2004) ("airport interviews only are useful and probative if they are reliable"); Ramsameachire v. Ashcroft, 357 F.3d 169, 179 (2d Cir. 2004) ("The airport interview is an inherently limited forum for the alien to express the fear that will provide the basis for his or her asylum

9

claim, and the BIA must be cognizant of the interview's limitations when using its substance against an asylum applicant."); Balasubramanrim v. INS, 143 F.3d 157, 164 (3d Cir. 1998) ("That there were some inconsistencies between the airport statement and Balasubramanrim's testimony before the immigration judge is not sufficient, standing alone, to support the Board's finding that Balasubramanrim was not credible.")

We have had no occasion to address the reliability of airport interviews, and this case continues that trend. There was other evidence in the record supporting Yang's account of the events, but even assuming for present purposes that everything he said is true, he still has not met his burden to establish that the BIA's decision to deny him asylum and withholding of removal was not supported by substantial evidence, as we discuss below.

Yang next argues that the BIA's decision that only legal spouses are entitled to protection under the family planning provisions of the refugee statute, 8 U.S.C. § 1101(a)(42), is an unreasonable application of that statute. In its In re C-Y-Z-, 21 I. & N. Dec. 915 (BIA 1997) (en banc) decision, the BIA confirmed the INS' position that "the spouse of a woman who has been forced to undergo an abortion or sterilization procedure can thereby establish past persecution." Id. at 918. Quoting from a 1996 INS memorandum, the BIA said that "an applicant whose spouse was forced to undergo an abortion or involuntary sterilization has suffered

10

past persecution, and may thereby be eligible for asylum under the terms of the new refugee definition." Id. at 917–18.

In its In re S-L-L-, 24 I. & N. Dec. 1 (BIA 2006) (en banc), decision the BIA "decline[d] to extend [its] holding in Matter of C-Y-Z-, as modified, to unmarried applications claiming persecution based on a partner's abortion or sterilization." Id. at 4. "[W]e limit our holding to applicants who are legally married under Chinese law." Id. (footnote omitted). This limitation was necessary, the BIA said, because "the sanctity of marriage and the long term commitment reflected by marriage place the husband in a distinctly different position from that of an unmarried father. From the point of view of the wife, the local community, and the government, a husband shares significantly more responsibility in determining, with his wife, whether to bear a child in the face of societal pressure and government incentives . . . ." Id. at 9. The BIA continued: "In the absence of a legal marriage, evaluating the existence of the requisite nexus is problematic, both as to whether the applicant was, in fact, the father of the child and as to whether local officials considered him responsible, or were even aware of his involvement." Id. at 9–10.

Yang argues that the legal marriage requirement in S-L-L- is unreasonable. The BIA's interpretation of immigration statutes are due Chevron deference where appropriate. Balogun v. U.S. Att'y Gen., 425 F.3d 1356, 1361 (11th Cir. 2005).

11

"Under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778 (1984), where Congress in a statute has not spoken unambiguously on an issue, the interpretation of the statute by an agency entitled to administer it is entitled to deference so long as it is reasonable." Mazariegos, 241 F.3d at 1327 n.4. "The degree of deference is especially great in the field of immigration." Id.

The decision to allow husbands to claim refugee status because their wives were forced to have abortions was based solely on the BIA's interpretation of the refugee statute in C-Y-Z- and S-L-L-, and not on anything Congress explicitly said in § 1101(a)(42). Because Yang concedes that he was not Ling's legal spouse, we have no occasion to decide whether the BIA's interpretation of the refugee statute is due Chevron deference. See generally Lin v. United States Dep't of Justice, ___ F.3d ___, 2007 WL 2032066 (2d Cir. July 16, 2007) (en banc) (rejecting the BIA's position that 8 U.S.C. § 1101(a)(42) extends automatic refugee status to spouses of individuals that the provision expressly protects). Instead, all we need decide is whether, assuming husbands of women who were forced to have an abortion are entitled to asylum for that reason, the BIA's decision to deny derivative protection to unmarried fathers of aborted children is unreasonable.

We conclude that it is not. As the Board noted in the S-L-L- decision, legal marriage reflects a sanctity and long-term commitment that other forms of

12

cohabitation simply do not. A legal husband, at least in the eyes of the government, shares significantly more responsibility in determining, with his wife, whether to bear a child in the face of societal pressure and government incentives.

Furthermore, as the BIA observed, "benefits and presumptions based on marriage are found in so many other areas of the law and in other provisions of the Immigration and Nationality Act that 'it would seem absurd to characterize reliance on marital status in C-Y-Z- as arbitrary and capricious.'" S-L-L-, 24 I. & N. Dec. at 9 (quoting Chen v. Ashcroft, 381 F.3d 221, 227 n.6 (3d Cir. 2004)). We agree. Paternity of the baby is presumed when a woman gives birth in wedlock. As the BIA noted, determining paternity of the aborted baby is considerably more difficult, yet essential for asylum based on family planning refugee status, where the mother and father have no legal relationship. Id. at 10. Using marital status is "a rough way of identifying a class of persons whose opportunities for reproduction and child-rearing were seriously impaired or who suffered serious emotional injury as the result of the performance of a forced abortion or sterilization on another person." Id. at 9 (quoting Chen, 381 F.3d at 227). Any other rule "would create numerous practical difficulties that the BIA might reasonably have chosen to avoid." Id. at 10 (quoting Chen, 381 F.3d at 228).

We recognize that two circuits have held that when a couple has taken all the steps necessary to be married, including a traditional wedding, but are precluded

13

from marrying due to the age requirements of the family planning laws, then the couple should be considered married for the purposes of claiming asylum under the C-Y-Z- decision. Ma v. Ashcroft, 361 F.3d 553, 558–61 (9th Cir. 2004); Zhang v. Gonzales, 434 F.3d 993, 999 (7th Cir. 2006). However, both of those decisions were rendered before the BIA's S-L-L- decision interpreting the spouse requirement in C-Y-Z-, and therefore are of little persuasive value now. Having conducting our own Chevron analysis after S-L-L-, we find the requirement that an applicant be "legally married" to the mother of his aborted child to be reasonable for the reasons discussed above. Because Yang and Ling's traditional marriage was not recognized under the laws of China, Yang cannot claim refugee status under the provision in § 1101(a)(24) that "a person who has been forced to abort a pregnancy . . . shall be deemed to have been persecuted on account of political opinion."

Yang's final argument is that even if he was not legally married to Ling, he is still a refugee under the part of § 1101(a)(42) which grants protection to any "person . . . who has been persecuted for . . . other resistance to a coercive population control program." In S-L-L- the BIA explained:

> That the holding in Matter of C-Y-Z- is limited to legally married spouses does not mean that an unmarried applicant may never demonstrate past persecution in the context of a partner's forced abortion or sterilization. . . . [T]here may be cases in which an unmarried partner in an extremely close and committed relationship

14

may demonstrate persecution based on the clause referring to "other resistance to a coercive population control program."

24 I. & N. Dec. at 10.

The BIA held that "[i]n the context of coercive family planning, the term 'resistance' covers a wide range of circumstances, including expressions of general opposition, attempts to interfere with enforcement of government policy in particular cases, and other overt forms of resistance to the requirements of the family planning law." Id. In a follow up to S-L-L-, the Ninth Circuit held that an applicant establishes "resistance" where he "physically or vocally resisted birth control officials while the officials performed duties related to the birth control program." Lin v. Gonzales, 472 F.3d 1131, 1135 (9th Cir. 2007). However, "[i]n addition to meeting the nexus requirement based on 'resistance' to the family planning law, an applicant claiming persecution based on an unmarried partner's abortion must demonstrate that he has suffered harm amounting to persecution on account of that resistance." S-L-L-, 24 I. & N. Dec. at 10; see also Lin, 472 F.3d at 1135 ("Even though Lin resisted a coercive population control program, and thus satisfied the 'on account of political opinion' component of § 1101(a)(42)(B), this finding does not automatically establish persecution. Instead . . . Lin must also demonstrate past persecution or a well-founded fear of future persecution.").

Finally, in determining whether an unmarried partner is in an extremely

15

close and committed relationship with the pregnant mother, the BIA said one should look to:

> whether the couple has children together, has cohabited for a significant length of time, holds themselves out to others as a committed couple, has taken steps to have their relationship recognized in some fashion (perhaps having taken such steps repeatedly, as where permission to marry has been denied by authorities based on failure to meet the minimum age requirements), is financially interdependent, and whether persuasive objective evidence of that relationship's continued existence during the time that the applicant has been in the U.S. is presented.

S-L-L-, 24 I. & N. Dec. at 10–11 (quotation omitted).

In this case, the BIA found that Yang "ha[d] not met his burden of proving his persecution claim on account of his own resistance to a coercive population control program or resistance to the alleged forced abortion of his partner." Even assuming that the documentary evidence established that Ling and Yang had an extremely close and committed relationship and that Yang resisted family planning officials at the hospital where Ling was taken to have an abortion, the evidence does not compel the conclusion that Yang was persecuted on account of his resistance to Ling's abortion. The documentary evidence established: (1) that Yang had a physical altercation with family planning officials; (2) that Yang was subpoenaed by the local security office; (3) the "cadres of the Family Planning Unit were looking for [Yang] and tried to arrest him"; and (4) "the Family Planning Officials and the Village Cadres are still looking for [Yang] and tried to

16

arrest [him]."

This is insufficient to establish persecution. In <u>Zheng v. United States Attorney General</u>, 451 F.3d 1287 (11th Cir. 2006), we held that evidence the asylum petitioner had been detained by the Chinese government for five days but had suffered no injuries did not compel the conclusion that he had been persecuted. <u>Id.</u> at 1290–91. Here, Yang was not detained for any length of time and, as far as we can tell from the record, suffered no physical injuries from his encounter with the family planning officials. While Yang was subpoenaed and threatened with arrest for opposing China's family planning laws, the State Department's country report, in the section titled "Penalties and Rewards," stated that in the Fujian province where Yang is from, those who have more children than permitted are assessed a fine, but the Consulate General "did not find any cases of physical force actually employed in connection with abortion or sterilization. In interviews of Fujian visa applicants who had several children, U.S. Consular officers found many violators of the one-child policy paid fines; however, the officers had personally seen no forced abortion or property confiscation."

From this record, having suffered no prolonged detention or physical violence, and being at little risk of physical violence for having opposed the family planning laws if returned to China, we are not compelled to conclude that Yang was subject to past persecution or has a well-founded fear of future persecution.

17

Accordingly, we will deny his petition to review the BIA's decision on his asylum claim.

Moreover, because there is no evidence compelling a finding that Yang was persecuted, he cannot meet the higher burden for withholding of removal by pointing to evidence compelling a finding that it is more likely than not that he will be persecuted upon his return to China. See Al Najjar, 257 F.3d at 1292–93 ("Where an applicant is unable to meet the 'well-founded fear' standard for asylum, he is generally precluded from qualifying for either asylum or withholding of [removal]."). We will therefore deny his petition to review the BIA's decision on his withholding of removal claim.

PETITION DISMISSED IN PART AND DENIED IN PART.