# In re S-L-L-, Respondent

*Decided September 19, 2006*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) An alien whose spouse was forced to undergo an abortion or sterilization can establish past persecution on account of political opinion and qualify as a refugee within the definition of section 101(a)(42) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42) (2000), but only if the alien was, in fact, opposed to the spouse's abortion or sterilization and was legally married at the time of the abortion or sterilization. *Matter of C-Y-Z-*, 21 I&N Dec. 915 (BIA 1997), reaffirmed and clarified.

(2) Unmarried applicants claiming persecution related to a partner's coerced abortion or sterilization may qualify for asylum if they demonstrate that they have been persecuted for "other resistance to a coercive population control program" within the meaning of section 101(a)(42) of the Act.

FOR RESPONDENT: Stephen P. Gleit, Esquire, New York, New York

FOR THE DEPARTMENT OF HOMELAND SECURITY: William J. Howard, Principal Legal Advisor

BEFORE: Board En Banc: OSUNA, Acting Vice Chairman; HOLMES, HURWITZ, GRANT, MOSCATO, MILLER, and HESS, Board Members. Concurring Opinion: PAULEY, Board Member. Concurring and Dissenting Opinion: FILPPU, Board Member, joined by COLE, Board Member.

HOLMES, Board Member:

The United States Court of Appeals for the Second Circuit has remanded this case with a request that we further explain our rationale in *Matter of C-Y-Z-*, 21 I&N Dec. 915, 919 (BIA 1997), "for construing IIRIRA § 601(a) to provide that the 'forced sterilization of one spouse on account of a ground protected under the Act is an act of persecution against the other spouse' and that, as a result, the spouses of those directly victimized by coercive family planning policies are *per se* as eligible for asylum as those directly victimized themselves," and that we "clarify whether, when, and why boyfriends and fiancés may or may not similarly qualify as refugees pursuant to

IIRIRA § 601(a)." *Lin v. U.S. Dep't of Justice*, 416 F.3d 184, 192 (2d Cir. 2005).[1]

## I. FACTUAL AND PROCEDURAL HISTORY

The respondent, a native and citizen of the People's Republic of China ("PRC"), conceded removability in proceedings before the Immigration Judge but applied for asylum, withholding of removal, and protection under the regulations implementing the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture"). The respondent's asylum claim was based principally on the allegation that in September1990 the PRC Government forced his girlfriend to abort their child. The respondent argued that we should extend to his case our decision in *Matter of C-Y-Z-*, *supra*, holding that an applicant whose spouse was forced to undergo an abortion or sterilization procedure may establish past persecution on account of political opinion.

On May 9, 2000, an Immigration Judge reasoned that our holding in *Matter of C-Y-Z-* was limited to spouses and did not apply to an applicant whose girlfriend had been forced to undergo an abortion. Consequently, he denied the respondent's applications for asylum and withholding of removal, as well as his request for protection under the Convention Against Torture. On September 20, 2002, we affirmed the Immigration Judge's decision without opinion and the respondent appealed to the Second Circuit.

## II. STATUTORY AND CASE LAW

In 1989, we held that implementation of the Chinese Government's "one couple, one child" policy did not constitute persecution on account of one of the five reasons enumerated in section 101(a)(42)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42)(A) (1982), even to the extent that involuntary sterilizations may occur. *Matter of Chang*, 20 I&N Dec. 38 (BIA 1989). Following our holding in *Matter of Chang*, Congress amended section 101(a)(42) of the Act in 1996 to add the following provision to the definition of a "refugee":

---

[1] The Second Circuit remanded two other cases in the opinion issued in *Lin v. U.S. Dep't of Justice*, *supra*. The remands in those cases will be addressed in separate decisions applying the law and reasoning set forth in this decision.

> For purposes of determinations under this Act, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, § 601(a), 110 Stat. 3009-546, 3009-689 ("IIRIRA") (codified at section 101(a)(42) of the Act, 8 U.S.C. § 1101(a)(42) (2000)).

In *Matter of C-Y-Z-, supra*, we held that a husband whose wife was forcibly sterilized could establish past persecution under this amendment to section 101(a)(42) of the Act. The position of the former Immigration and Naturalization Service, now the Department of Homeland Security ("DHS"), was that "an applicant whose spouse was forced to undergo an abortion or involuntary sterilization has suffered past persecution, and may thereby be eligible for asylum under the terms of the new refugee definition." *Matter of C-Y-Z-, supra*, at 917-18 (quoting Memorandum from the Office of the General Counsel of the Immigration and Naturalization Service 4 (Oct. 21, 1996)). In its brief, the Service stated that "the husband of a sterilized wife can essentially stand in her shoes and make a *bona fide* and non-frivolous application for asylum based on problems impacting more intimately on her than on him." *Id*. at 918. Given the agreement of the parties that the respondent could claim asylum based on his wife's sterilization under the amendment to section 101(a)(42), we did not provide the sort of detailed statutory analysis that would have been required had the issue been in dispute. Although *Matter of C-Y-Z-* involved a spouse's forced sterilization, the holding has been understood to apply to a spouse's forced abortion as well.[2]

## III. ANALYSIS

In its brief addressing the issues on remand, the DHS requests that we replace the rule adopted in *Matter of C-Y-Z-, supra*, with a case-by-case approach grounded in the "other resistance" clause of section 101(a)(42) of the Act. Under this approach, an applicant claiming persecution based on an abortion forced upon a spouse, girlfriend, or fiancée would have to show that

---

[2] *See, e.g., Ma v. Ashcroft*, 361 F.3d 553, 559 (9th Cir. 2004), noting that "[t]he BIA and the courts have uniformly applied the statute's protections to husbands whose wives have undergone abortions or sterilization procedures, as well as to the wives themselves."

he was targeted for persecution on account of his "resistance" to the family planning laws and that the resulting harm amounted to past persecution. The respondent's brief asks us to extend the holding of *Matter of C-Y-Z-* to boyfriends and fiancés whose partners were forced to abort a child.

As explained below, we reaffirm our holding in *Matter of C-Y-Z-*, but clarify its intended scope in two respects. First, we limit our holding to applicants who were, in fact, opposed to a spouse's abortion or sterilization. An applicant who encouraged or supported a spouse's abortion or sterilization, could not, in good faith, claim to have suffered harm amounting to persecution for purposes of asylum. Second, as discussed below, we limit our holding to applicants who are legally married under Chinese law.[3]

We decline to extend our holding in *Matter of C-Y-Z-*, as modified, to unmarried applicants claiming persecution based on a partner's abortion or sterilization. Rather, in such cases, the applicant must show, as discussed in Part III.B. below, that he or she qualifies under the terms of the "other resistance" clause in section 101(a)(42).

## A. Forced Abortions Involving Married Couples

We begin by noting the obvious, that our decision in *Matter of C-Y-Z-*, *supra*, reflects the significant tensions inherent in the IIRIRA amendment to section 101(a)(42) of the Act. There is no clear or obvious answer to the scope of the protections afforded by the amendment to partners of persons forced to submit to an abortion or sterilization. The interpretive lines, no matter where drawn, will be vulnerable to criticism that they are over-inclusive, under-inclusive, inadequately tied to statutory language, or unmanageable in practice. The DHS has a significant role in the adjudication of asylum and withholding of removal cases, and, particularly in that context, we took seriously the fact that the parties were in agreement as to the resolution of the issues presented. The fact that the parties agree is not determinative, but the result agreed upon by the parties in *Matter of C-Y-Z-*, as discussed below, was consistent with the focus of the amendment and the legislative history on the offensiveness of the PRC's use of forced abortions and sterilizations to implement its "one couple, one child" policy.

We also note at the outset that the position we articulated in *Matter of C-Y-Z-* in 1997 is a precedent of long standing at this point. The Attorney General recently rejected a request to review our decision, and numerous court decisions have deferred to the holding in *Matter of C-Y-Z-*. *See Matter of C-Y-Z-*, 23 I&N Dec. 693 (A.G. 2004). Most recently, rather than limiting the scope of protection afforded by the IIRIRA amendment, Congress repealed

---

[3] No issue was raised in *Matter of C-Y-Z-*, *supra*, regarding the legality of the marriage.

the 1000 annual cap initially placed on the numbers of asylees who could be admitted pursuant to a finding of persecution under that provision. REAL ID Act of 2005, Div. B of Pub. L. No. 109-13, § 101(g)(2), 119 Stat. 231, 305 (repealing former section 207(a)(5) of the Act, 8 U.S.C. § 1157(a)(5) (2000)). Had Congress believed that we had erroneously interpreted the amendment to section 101(a)(42), it seems unlikely that it would have removed the number limits on such grants, while leaving untouched our holding in *Matter of C-Y-Z-*.

The IIRIRA amendment to section 101(a)(42) of the Act does not explicitly refer to spouses in any of the three clauses describing the categories of persons deemed to have been subjected to political persecution. The lack of such a reference, however, does not necessarily preclude an applicant from demonstrating past persecution based on harm inflicted on a spouse when both spouses are harmed by government acts motivated by a couple's shared protected characteristic. For example, putting aside the amendment for a moment, if a government, as part of a campaign of persecution against members of a particular religious group, subjected married couples within that religious group to a policy of mandatory sterilization, the government's sterilization of either party to the marriage harms both individuals and is on account of the religion of both.[4] Although there is no specific reference in the statutory definition of a refugee to a husband's claim based on harm inflicted upon his wife, the general principles regarding nexus and level of harm apply in determining such a claim.[5]

We apply the same general principles requiring nexus and level of harm for past persecution in assessing a claim under the IIRIRA amendment. In so doing we also keep in mind the purposes for which Congress enacted the amendment, i.e., to afford refugee status to persons whose fundamental human rights were violated by a government's application of its coercive family planning policy. *See Yuan v. U.S. Dep't of Justice*, 416 F.3d 192, 195 (2d Cir. 2005) (citing *Coercive Population Control in China: Hearings Before the*

---

[4] *See Matter of Chang*, *supra*, at 44, indicating, prior to passage of the amendment, that past persecution could be established if there was evidence that coercive family planning practices were selectively applied against members of particular religious groups or for other grounds protected under the Act.

[5] The regulatory framework for establishing asylum eligibility provides that an applicant may qualify as a refugee by establishing that he or she either has suffered past persecution or has a well-founded fear of future persecution. Past persecution is established if the applicant "has suffered persecution in the past in the applicant's country of nationality . . . on account of race, religion, nationality, membership in a particular social group, or political opinion, and is unable or unwilling to return to, or avail himself or herself of the protection of, that country owing to such persecution." 8 C.F.R. § 1208.13(b)(1) (2006).

*Subcomm. on Int'l Operations & Human Rights of the House Comm. on Int'l Relations*, 104th Cong. (1995)); *Zhao v. U.S. Dep't of Justice*, 265 F.3d 83, 92 (2d Cir. 2001) (same); *see also Ma v. Ashcroft*, 361 F.3d 553, 559 (9th Cir. 2004) (finding that "Congress's goal in passing the amendments [was] to provide relief for 'couples' persecuted on account of an 'unauthorized' pregnancy and to keep families together" (citing H.R. Rep. No. 104-469(I), at 174 (1996))).

In its brief, the DHS argues that the first two categories of persons deemed to have suffered past persecution under the terms of the IIRIRA amendment–those "forced to abort a pregnancy or to undergo involuntary sterilization" and those who refuse to undergo such a procedure–are limited to the person directly subjected to the medical procedure or punished for refusing the medical procedure. Therefore, the DHS suggests that *Matter of C-Y-Z-* must be based on the "other resistance" clause of section 101(a)(42).

When considered in light of the reasons Congress expanded the refugee protections to include persecution based on coercive family planning, and the well-established principles regarding nexus and level of harm for past persecution, we understand the husband, as well as the wife, to have been subjected to the coercive family planning policy when the government forces an abortion on a married couple. Although the wife is obviously the individual subjected to the abortion procedure, Congress was concerned not only with the offensive assault upon the woman, but also with the obtrusive government interference into a married couple's decisions regarding children and family. When the government intervenes in the private affairs of a married couple to force an abortion or sterilization, it persecutes the married couple as an entity. We therefore find that Congress intended section 101(a)(42) to protect both spouses when the government has forced a married couple opposed to an abortion to submit to such a procedure.

The PRC Government explicitly imposes joint responsibility on married couples for decisions related to family planning. The Population and Family Planning Law, for example, provides that "*husband and wife bear common responsibility in implementing family planning.*" Population and Family Planning Law (adopted at the Standing Comm. Nat'l People's Cong., Dec. 29, 2001, effective Sept. 1, 2002), art. 17, *translated in* Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *China–Profile of Asylum Claims and Country Conditions* 41 (Oct. 2005) [hereinafter 2005 *Profile*] (emphasis added).[6]   A married couple may be subjected to social ostracism

---

[6]  A translation of the 2001 Population and Family Planning Law is included as Appendix A to the 2005 *Profile*, *supra*. Article 49 of the 1982 Chinese Constitution similarly provides that both the husband and the wife have an obligation to practice family planning. *See* INS

(continued...)

and pressures from Government officials to agree to submit to an abortion.[7] They may be threatened with fines, their property may be damaged or confiscated, and one or both spouses threatened with demotion, job loss, or other economic sanctions for refusing to agree to an abortion. If such efforts fail, an abortion may ultimately be imposed upon the couple.[8] Given the shared responsibility of husband and wife for decisions related to having a family and the PRC Government's treatment of the married couple as a partnership with common responsibility for complying with the family planning laws, we are willing to presume, in the absence of evidence to the contrary, that the Government focuses on the married couple as a unit when it intervenes to force an abortion.

A forced abortion imposed on a married couple naturally and predictably has a profound impact on both parties to the marriage. Although a forced abortion does not entirely end a couple's procreative potential, the forced abortion, like sterilization, "deprive[s] a couple of the natural fruits of conjugal life, and the society and comfort of the child or children that might eventually have been born to them." *Matter of Y-T-L-,* 23 I&N Dec. 601, 607 (BIA 2003). A husband also suffers emotional and sympathetic harm arising from his spouse's mistreatment and the infringement on their shared reproductive rights. *Chen v. Ashcroft,* 381 F.3d 221, 225-26 (3d Cir. 2004). Local PRC Government officials understand this when they force a married couple to abort their prospective child. We find that such Government action is explicitly directed against both husband and wife for violation of the Government-imposed family planning law and amounts to persecution of both parties to the marriage.

As recognized in *Chen v. Ashcroft, supra,* the ruling in *Matter of C-Y-Z-* is plausibly based on "the assumption that the persecution of one spouse by means of a forced abortion or sterilization causes the other spouse to experience intense sympathetic suffering that rises to the level of persecution."

---

[6] (...continued)
Resource Information Center, U.S. Dep't of Justice, *Profile Series, China: Family Planning Policy and Practice in the People's Republic of China*, PR/CHN/95.001A, at 2 (Mar. 1995). Article 12 of the 1980 Marriage Law also contains the explicit requirement that "[b]oth husband and wife shall have the duty to practice family planning." *Id*. at 6.

[7] The State Department notes that "[b]ecause penalties can be theoretically levied against a spouse's work unit or against local officials for allowing out-of-plan births, many individuals and organizations are affected, providing multiple sources of pressure on couples. The scope and intensity of the pressure often leave expectant mothers feeling that they have little choice but to undergo abortion." 2005 *Profile, supra*, at 21.

[8] The State Department reports that the "[c]entral government policy prohibits the use of physical coercion to compel persons" to submit to abortion or sterilization. However, "[r]eports of physical coercion continue to be heard." 2005 *Profile, supra*, at 21-22.

*Id.* at 225.  The impact of forced abortions or sterilizations on a husband and wife's shared right to reproduce and raise children is such that "the forced sterilization of a wife could be 'imputed' to her husband, 'whose reproductive opportunities the law considers to be bound up with those of his wife.'" *Id.* at 226 (quoting *Lin v. Ashcroft*, 356 F.3d 1027, 1041 (9th Cir. 2004)).[9]

The DHS expresses concerns in its brief that the rule in *Matter of C-Y-Z-* may open the door to asylum for husbands who were not, in fact, opposed to a spouse's abortion or sterilization or who actually encouraged a spouse to submit to an abortion or sterilization procedure.  We clarify that our holding in *Matter of C-Y-Z-* was not intended to, and does not, include such cases.  A husband who participated in attempts to persuade his wife to submit to an abortion, or who favored the abortion, could not, in good faith, claim to have been persecuted as a result of the abortion.

We do not require proof in the individual case that the local PRC Government officials involved were confronted by the husband or otherwise made aware of the husband's opposition.  Rather, absent evidence that the spouse did not oppose an abortion or sterilization procedure, we interpret the forced abortion and sterilization clause of section 101(a)(42) of the Act, in light of the overall purpose of the amendment, to include both parties to a marriage.

In conclusion, we reaffirm *Matter of C-Y-Z-* with regard to married couples subject to the clarifications made by this decision.  When parties have legally committed to marriage, we recognize the requisite nexus and level of harm for past persecution when a spouse is forced to undergo an abortion or sterilization procedure.

### B.  Boyfriends, Fiancés, and Other Unmarried Partners

The second question to be addressed on remand is whether boyfriends and fiancés should qualify for refugee status under the IIRIRA amendment to section 101(a)(42) of the Act in the same manner as an applicant whose spouse is subjected to a forced abortion or sterilization.  As explained below, we decline to extend *Matter of C-Y-Z-* to an applicant whose claim is that his girlfriend or fiancée was subjected to a forced abortion.

*Matter of C-Y-Z-* relies on marriage as the linchpin.  In the absence of proof to the contrary, we recognize, in the case of a husband opposed to a spouse's abortion, that the loss of the child and the interference with the couple's reproductive rights, is harm to both spouses amounting to past persecution.

---

[9] *Lin v. Ashcroft, supra*, was amended and superseded on denial of rehearing, but the quoted language remained in the amended decision. *See Jie Lin v. Ashcroft*, 377 F.3d 1014, 1030 (9th Cir. 2004).

8

We do not find convincing reasons to extend the nexus and level of harm attributed to a husband who was opposed to his wife's forced abortion to a boyfriend or fiancé.

As indicated above, the sanctity of marriage and the long term commitment reflected by marriage place the husband in a distinctly different position from that of an unmarried father. From the point of view of the wife, the local community, and the government, a husband shares significantly more responsibility in determining, with his wife, whether to bear a child in the face of societal pressure and government incentives than does a boyfriend or fiancé for the resolution of a pregnancy of a girlfriend or fiancée.

Several circuit courts have deferred to unpublished Board decisions refusing to extend the holding in *Matter of C-Y-Z-* to unmarried partners. *See, e.g.*, *Chen v. Gonzales*, 457 F3d. 670, 674 (7th Cir. 2006) (declining to extend the definition of "refugee" to reach boyfriends). *Chen v. Ashcroft*, *supra* (holding that an applicant whose fiancée was forced to have an abortion was not protected under *Matter of C-Y-Z-*); *Wang v. U.S. Att'y Gen.*, 152 Fed. Appx. 761 (11th Cir. 2005) (recognizing that a forced abortion or sterilization may not be imputed beyond the marital relationship). The Third Circuit explains in *Chen v. Ashcroft*, *supra*, at 227, that *Matter of C-Y-Z-* "uses marital status as a rough way of identifying a class of persons whose opportunities for reproduction and child-rearing were seriously impaired or who suffered serious emotional injury as the result of the performance of a forced abortion or sterilization on another person."[10] While recognizing that the classification is "both over- and under-inclusive," the court in *Chen* noted that benefits and presumptions based on marriage are found in so many other areas of the law and in other provisions of the Immigration and Nationality Act that "it would seem absurd to characterize reliance on marital status in *C-Y-Z-* as arbitrary and capricious." *Id*. at 227 n.6.

We recognize that drawing the line at marriage is not an exact measure of either nexus or level of harm. Requiring marriage, however, is a practical and manageable approach which takes into account the language and purpose of the statutory definition in light of the general principles of asylum law. In the absence of a legal marriage, evaluating the existence of the requisite nexus is problematic, both as to whether the applicant was, in fact, the father of the child and as to whether local officials considered him responsible, or were

_____

[10]  In *Chen*, after the applicant's fiancée became pregnant, they applied for a marriage license but were turned down because they could not meet the minimum age requirements. After a confrontation with local planning officials, Chen left China for the United States. Once here, he learned that his fiancée had been found and forced to have an abortion. He sought asylum based on his fiancée's forced abortion.

even aware of his involvement.[11] As the court in *Chen* recognized, "[A] rule extending *C-Y-Z-* to non-spouses would create numerous practical difficulties that the BIA might reasonably have chosen to avoid." *Chen v. Ashcroft, supra*, at 228. Proof or presumption of paternity, for example, may be considerably more difficult when a boyfriend claims to have fathered a child who was forcibly aborted by government officials. For all of the reasons identified above, we do not extend the approach of *Matter of C-Y-Z-* to boyfriends or fiancés.

That the holding in *Matter of C-Y-Z-* is limited to legally married spouses does not mean that an unmarried applicant may never demonstrate past persecution in the context of a partner's forced abortion or sterilization. As the DHS acknowledges in its brief, there may be cases in which an unmarried partner in an extremely close and committed relationship may demonstrate persecution based on the clause referring to "other resistance to a coercive population control program."

The term "resistance" is not defined in the Act. The ordinary meaning of "resistance," however, is "an act or instance of resisting" or "opposition." *Merriam Webster's Collegiate Dictionary* 994 (10th ed. 2002). To "resist" is "to exert force in opposition," "to exert oneself so as to counteract or defeat," or "to withstand the force or effect of." *Id.* In the context of coercive family planning, the term "resistance" covers a wide range of circumstances, including expressions of general opposition, attempts to interfere with enforcement of government policy in particular cases, and other overt forms of resistance to the requirements of the family planning law.

In addition to meeting the nexus requirement based on "resistance" to the family planning law, an applicant claiming persecution based on an unmarried partner's abortion must demonstrate that he has suffered harm amounting to persecution on account of that resistance. According to the DHS, the relevant factors to be considered in identifying such cases may include whether the couple "has children together, has cohabited for a significant length of time, holds themselves out to others as a committed couple, has taken steps to have their relationship recognized in some fashion (perhaps having taken such steps

---

[11] As the court in *Chen* noted, "[T]he BIA might also have been concerned that unmarried asylum-seekers would falsely claim to have had an intimate relationship with a person who suffered a forced abortion or sterilization, and the BIA might have felt that it would be too difficult to distinguish between those unmarried persons who had a truly close relationship with the person who underwent the medical procedure and those unmarried asylum seekers who did not." *Chen v. Ashcroft, supra*, at 229 (footnotes omitted). In enacting the coercive family planning protections, members of Congress expressed concern that "young Chinese single-unmarried-males" might take advantage of the amendment to the "refugee" definition in section 101(a)(42) of the Act. 142 Cong. Rec. S4592, S4593 (1996) (statement of Sen. Simpson), 1996 WL 220426.

repeatedly, as where permission to marry has been denied by authorities [based on failure to meet the minimum age requirements]), is financially interdependent, and [whether] persuasive objective evidence of that relationship's continued existence during the time that the applicant has been in the U.S. is presented."

## IV. RESPONDENT'S ASYLUM CLAIM

The respondent is a 41-year-old citizen of the PRC. His asylum application provides the following account of events which occurred prior to his January 1991 entry to the United States.[12] After "going steady" for about 2 years, the respondent's girlfriend, then age 18, told the respondent that she "felt like being pregnant." They requested a marriage license but were turned down because the respondent's girlfriend was under the required age for marriage. After the respondent's girlfriend became pregnant, they sought permission from local family planning officials to have the child. This request was also denied and they were told that they "must have an abortion." Two days later the respondent's girlfriend was "forced to the hospital." After the abortion, they made plans to travel to the United States, but when the time came his girlfriend was "too weak" to travel, and the respondent came to the United States on his own. The respondent also indicated that he feared that he would be "put in prison for leaving the country without permission."

As explained in Part III.A. above, we decline to extend *Matter of C-Y-Z-* to unmarried couples. We therefore examine whether the facts alleged by the respondent demonstrate that he was persecuted based on "other resistance" to the family planning laws. The respondent's conduct relevant to the family planning policy includes impregnating his underage girlfriend, seeking permission to marry outside the age requirements for marriage, and seeking permission to have the child outside the age requirements for having children. The respondent did not otherwise claim to have expressed opposition or resistance to his girlfriend's abortion or the family planning regime.

Merely impregnating one's girlfriend does not constitute an act of resistance under the family planning laws within the meaning of section 101(a)(42) of the Act. *See Zhang v. Ashcroft*, 395 F.3d at 531, 532 (5th Cir. 2004). In some cases a pregnancy may have been unplanned or even unwanted. The respondent merely asserts that his girlfriend "felt like being pregnant." The

---

[12] The Immigration Judge and the parties agreed to accept the truth of the events recounted in the asylum application without taking testimony from the respondent. *See Matter of Fefe*, 20 I&N Dec. 116, 119 (BIA 1989) (stating that in lieu of hearing testimony, the parties may stipulate that an "applicant's written statement is believable and that the applicant could have presented oral testimony consistent with that statement").

respondent's requests for permission to marry and to have a child outside the age limits are likewise insufficient to indicate resistance to coercive family planning laws.  Rather, the respondent appears to have attempted to comply with the law by seeking an exception to the usual age requirements.  Once permission was denied, he did not take steps to avoid or prevent the abortion that might have been perceived as "resistance."

The respondent asserts that he should be afforded asylum because he and his girlfriend were denied permission to marry and bear a child based on the minimum age requirements of the Chinese family planning law.[13]  He argues that but for the minimum age requirements, he and his girlfriend would have married and, therefore, *Matter of C-Y-Z-* should apply to his case.  In *Chen v. Ashcroft*, *supra*, the Third Circuit rejected the argument that persons who would have married but for the minimum age laws must be included within the scope of *Matter of C-Y-Z-*.  The court reasoned that however sympathetic such arguments might be, there are rational reasons, as discussed above, for limiting *Matter of C-Y-Z-* to couples who have actually committed to a marital relationship.  *See Chen v. Ashcroft*, *supra*, at 232.  For the reasons indicated above, we require that an applicant have entered into a legally recognized marriage in order to be considered a spouse within the meaning of *Matter of C-Y-Z-*.[14]  The respondent in this case has not demonstrated that he has been persecuted on account of resistance to the PRC Government's family planning policy.  In regard to future persecution, he has not asserted or demonstrated a well-founded fear of future harm based on application of the coercive family planning law or policy.  He indicated only that he feared he would be imprisoned for departing China without permission.[15]  The fact that a country

---

[13]  Under PRC law, no marriage may be contracted before the man is age 22 and the woman is 20.  2005 *Profile*, *supra*, at 22.  An underage couple living in an unregistered de facto marital relationship is not recognized as a married couple by the Government, and the parties to such a relationship do not have the legal rights and obligations of a married couple.  Regulations on Control of Marriage Registration (adopted by the State Council, Jan. 12, 1994, and promulgated by Decree No. 1 of the Ministry of China, Feb. 1, 1994), art. 24, http://english.gov.cn/2005-07/29/content_18376.htm.

[14]  We recognize that two circuit courts have decided to the contrary when an underage couple has entered into a traditional marriage ceremony.  *Zhang v. Gonzales*, 434 F.3d 993 (7th Cir. 2006); *Ma v. Aschroft*, *supra*.

[15]  In the notice of appeal, the respondent's attorney wrote that the respondent's elder brother was killed while trying to intervene to prevent the girlfriend's abortion.  No such incident was included in the respondent's asylum application or mentioned in proceedings before the Immigration Judge, where the respondent had an opportunity to supplement the information in the asylum application.  The respondent's brief on appeal did not further address this unsupported allegation.  Nor has the respondent provided an amended asylum application or proffered supporting evidence, or even a statement, explaining the basis of

(continued...)

may punish a citizen for an illegal departure, however, does not generally qualify an alien for refugee protection. *See Li v. INS*, 92 F.3d 985, 988 (9th Cir. 1996); *Matter of Sibrun*, 18 I&N Dec. 354, 359 (BIA 1983). Therefore the respondent has not demonstrated eligibility for asylum or for withholding of removal under section 241(b)(3) of the Act, 8 U.S.C. § 1231(b)(3) (2000).

We also agree with the Immigration Judge that the respondent failed to demonstrate that he would more likely than not be tortured, as that term is defined by the regulations implementing the Convention Against Torture, were he to be returned to China. 8 C.F.R. §§ 1208.16(c), 1208.18(a) (2006). The core events in this case occurred over 15 years ago and the respondent has not demonstrated that the Chinese Government will likely subject him to mistreatment rising to the level of torture. We will therefore dismiss the respondent's appeal from the Immigration Judge's decision.

**ORDER:** The respondent's appeal is dismissed.

Chairman Lori L. Scialabba did not participate in the decision in this case.

*CONCURRING OPINION*: Roger A. Pauley

I respectfully concur. I agree with the majority that nothing in the Immigration and Nationality Act supports the extension of derivative asylum eligibility, under *Matter of C-Y-Z-*, 21 I&N Dec. 915 (BIA 1997), to unmarried partners of a man or woman forcibly sterilized or aborted. However, I disagree with the majority's determination to "reaffirm" *Matter of C-Y-Z-*, *supra*. Were we writing on a clean slate, I would adopt the lately arrived at position of the Department of Homeland Security ("DHS") that whether or not the spouse of a forcibly sterilized or aborted individual can be found to have been persecuted depends on a case-by-case assessment of whether that spouse was persecuted on account of "other resistance" to a coercive population control system, because the language of the Act does not support extending refugee status to any person other than the one sterilized or aborted, aside from the "other resistance" ground. In other words, I would hold that the DHS's original theory, accepted without analysis by the Board in *Matter of C-Y-Z-*, *supra,* at 918, that the spouse "stand[s] in [the] shoes" of the other spouse who was persecuted, is not sustainable. I have previously

---

[15] (...continued)
his knowledge of this incident and why he did not include such information in his asylum application. Under these circumstances, we do not find any reason to remand for consideration of evidence which, if it exists, has not been shown to have been unavailable during the proceedings below.

had occasion to voice doubts about the correctness of *Matter of C-Y-Z-* on the basis on which it was then decided, noting among other things that Congress's choice to put coerced population control claims in the category of "political opinion," rather than to create a unique and separate ground, was inconsistent with a general theory of derivative asylum eligibility.[1] *See Matter of Y-T-L*, 23 I&N Dec. 601, 618-20 (BIA 2003) (Pauley, dissenting).

However, notwithstanding my belief that *Matter of C-Y-Z-*, *supra*, was wrongly decided, I would not overrule it now, nearly a decade later and in the aftermath of thousands of decisions applying it to grant asylum on a derivative basis. Stare decisis is an important principle for any adjudicative body, whether a court or an appellate administrative agency such as the Board. Thus, for many of the same reasons as undergirded my separate opinion in *Matter of Assaad*, 23 I&N Dec. 553, 569-71 (BIA 2003) (Pauley, concurring), I would find that given the almost universal acceptance of *Matter of C-Y-Z-* and the extensive degree of reliance thereon, it is too late in the day for the Board to upset the applecart and reach a different conclusion.[2] It is, however, another thing to *extend* an untenable approach to afford asylum to additional thousands, or tens of thousands, of potential applicants as would result from applying *Matter of C-Y-Z, supra*, to unmarried partners of the victims of a coercive population control regime. For the reasons set forth in Part III.B. of the majority opinion, I concur in the result in this case.

---

[1] That theory has spawned other derivative claims, of dubious merit in my view, e.g., involving applicants who claim that their children may experience female genital mutilation ("FGM"). *See, e.g.*, *Abay v. Ashcroft*, 368 F.3d 634 (6th Cir. 2004). While FGM may be a pernicious form of persecution, it is difficult to understand why a fear that it may be performed on *another person*, albeit one's child, is a ground for asylum, any more than if a parent had a fear that a child would be singled out for persecution on account of political opinion, race, or religion.

[2] I note that were the Board to overrule *Matter of C-Y-Z-*, *supra*, the DHS could seek termination of asylum under section 208(c)(2)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1158(c)(2)(A) (2000), on the basis of a "fundamental change in circumstances." Whether a change in the Board's interpretation of the Act is a "fundamental change in circumstances" contemplated by the statute and regulations is an open question. *See Azanor v. Ashcroft*, 364 F.3d 1013, 1022 (9th Cir. 2004) (implicitly treating a change in United States asylum law as a "change in circumstances" under another regulation); *cf. also Matter of Y-T-L-*, *supra*, at 604-05.

I also take into account, as does the majority, Congress's recent elimination of the annual cap for persons found eligible for asylum for having been persecuted on the basis of a coercive population control program. However, I do not read into this elimination congressional *approval* of *Matter of C-Y-Z-*, but instead merely a practical recognition that, over the years, the unrealistically low cap had produced an unhealthy backlog of applicants awaiting permanent asylee status, including those women and men who *themselves* had been forcibly sterilized or aborted.

*CONCURRING and DISSENTING OPINION*:  Lauri Steven Filppu, Board Member, in which Patricia A. Cole, Board Member, joined

I concur in the result, but I respectfully dissent from the majority's reaffirmation of the "joint spousal persecution" theory announced in *Matter of C-Y-Z-*, 21 I&N Dec. 915 (BIA 1997).

In *Matter of C-Y-Z-, supra,* we accepted, without any statutory analysis, the parties' agreed view that the spouse of a forcibly sterilized woman qualified in his own right as a "refugee" because of past persecution.  We merely explained that this "position is not in dispute," thereby implicitly endorsing the stated view of the former Immigration and Naturalization Service ("INS") "'that the husband of a sterilized wife can essentially stand in her shoes and make a *bona fide* and non-frivolous application for asylum based on problems impacting more intimately on her than on him.'" *Id.* at 918 (quoting INS brief).  Despite the absence of an explicit "stand in the shoes" clause in the statute, this understanding of the law has gone largely unchallenged since 1997 and  has routinely been applied in both forced sterilization and forced abortion contexts.

Today, however, we do face a challenge to the "stand in the shoes" theory. The Department of Homeland Security ("DHS") disavows the prior position of its predecessor, the INS, and instead argues for an interpretation based on the actual language of the statute.  Importantly, the United States Court of Appeals for the Second Circuit remanded this very case for us to explain why "the spouses of those directly victimized by coercive family planning policies are *per se* as eligible for asylum as those directly victimized themselves," in part because the decision in *Matter of C-Y-Z-, supra,* "never . . . identified the specific statutory language pursuant to which it deemed spouses eligible for asylum." *Lin v. U.S. Dep't of Justice*, 416 F.3d 184, 191, 192 (2d Cir. 2005). These powerful entreaties for a reading grounded in statutory text are consonant with the vast body of case law declaring that statutory interpretation must begin with reference to the language and structure of the statute–the paramount indicia of legislative intent.  *E.g., INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987); *INS v. Phinpathya*, 464 U.S. 183, 189 (1984).

In the face of all this, the majority's opinion fails to discuss "the specific statutory language" supporting the "stand in the shoes" theory it reaffirms. The majority admits that none of the clauses of the statute explicitly refers to spouses in describing the categories of persons subjected to qualifying persecution.  *Matter of S-L-L-*, 24 I&N Dec. 1, 5 (BIA 2006).  It then interprets the "forced abortion and sterilization clause" of the statute "to include both parties to a marriage" as long as the husband opposed the

15

abortion. *Id.* at 8. But it does so "in light of the overall purpose" of the coercive population control amendment. *Id.* The majority never explains how the actual text of the statute supports its construction, or even how that text is actually ambiguous on the question of covering married couples, as opposed to all couples or just individuals.

The literal language of the statute, however, is contrary to the majority's ruling. As the DHS convincingly argues, the statute plainly focuses on "a person" who has been forced to abort a pregnancy, not on a "couple," let alone a married couple, or, in the majority's terms, "both parties to a marriage." *Matter of S-L-L-*, *supra*, at 8. The statute as a whole reinforces the ordinary meaning of "a person." In ordinary English usage, couples do not "undergo" medical procedures; only an individual will "undergo such a procedure." That "procedure," of course, is the forced abortion or sterilization. If this were not enough, the natural meaning of "a person" is inescapably clarified by the clause addressing "*a person* who has a well founded fear that *he or she* will be forced to undergo such a procedure." Section 101(a)(42) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42) (2000) (emphasis added). "[H]e or she" cannot reasonably be read to cover married couples.

Departures from literal text are warranted to correct scrivener's errors or to avoid absurdity, for example. Clarification and interpretation are justified to fill statutory gaps and resolve ambiguities. But exceptions such as these compel analysis and explanations founded first and foremost on statutory text. In no case do they justify avoiding a meaningful discussion of literal statutory language.

The majority claims no scrivener's error or absurdity to support joint spousal persecution. It does assert statutory ambiguity by claiming that "*Matter of C-Y-Z-*, *supra*, reflects significant tensions inherent" in the statute, and that all "interpretive lines" will be subject to criticism as "inadequately tied to statutory language." *Matter of S-L-L-*, *supra*, at 4. But it never explains where any ambiguity lies in the text of the law itself.

To the extent that "significant tensions" exist, I believe they were *caused by* our decision in *Matter of C-Y-Z-*, not reflected in it. The parties agreed to the result, and we simply adopted that agreement without any independent analysis. *Matter of C-Y-Z-*, *supra*, at 918. The tension that exists is between *Matter of C-Y-Z-* and the statute, not within the statute itself.

The majority invokes what it terms "well-established principles regarding nexus and level of harm" to say that both spouses automatically qualify when one is aborted. *Matter of S-L-L-*, *supra*, at 6. It claims that China "persecutes the married couple as an entity" when it "intervenes in the private affairs of a married couple to force an abortion or sterilization" *Id.* This might well provide some support for the spouse of an abortion victim to advance a claim under the "other resistance" clause of the statute. It is not a basis, however,

for treating that spouse as being the one who has undergone the abortion itself, as is the clear requirement of the "forced abortion and sterilization" clause.

The DHS actually argues for a focus on the "other resistance" clause when it comes to the independent qualification of a spouse who lacks a direct "forced abortion or sterilization" claim. All indications are that the majority rejects such a focus when it adopts an automatic entitlement rule for spouses in general. But it then proceeds to qualify its own "interpretation" to exclude any husband who was not, in fact, opposed to his wife's abortion. The separate views of a husband and wife on this subject would seem to qualify as "the private affairs of a married couple," as much as would jointly held views. And unless China actually knows of an otherwise private family dispute, it is impossible to understand how it intends to punish "the married couple as an entity" only in those cases where there is joint opposition to the abortion.

I agree that relief should not be available to a husband who favors an abortion his wife is forced to endure. But that is because such a husband has neither resisted China's coercive population control program nor suffered persecution from the abortion. "Family entity persecution," however, is simply a creative construct for deeming a husband to be "a person" who has undergone a forced abortion without any grounding in the statutory language itself.

The clearly applicable "general principle" as to spouses is already embodied in sections 207(c)(2) and 208(b)(3) of the Act, 8 U.S.C. §§ 1157(c)(2) and 1158(b)(3) (2000 & Supp. II 2002), according *derivative* status to spouses and children of aliens who qualify as refugees or for asylum. Each spouse to a marriage may well be able to show independent grounds for asylum as a principal in a given case, and that ground could be identical in some cases. But there is no general rule that the persecution of one spouse is imputed to the other such that both are independently deemed to qualify for relief.

Any legislative goal of *automatically* benefitting spouses is already accomplished in removal cases through the ordinary derivative asylum provisions of section 208(b)(3) of the Act. Congress, after all, placed its "coercive population control" amendment within the confines of the broader refugee and asylum statutes. Nothing in the language of that amendment suggests that it was intended to supersede or obviate derivative status for spouses in the abortion and sterilization context. Reliance on "derivative status" may not benefit every husband who can get asylum under the majority's approach, particularly those whose marriages have ended in death

or divorce.[1]  But, I am at a loss to understand the imperative, absent identifiable statutory text, to accord refugee status to men who have undergone no coercive procedure and who have left behind their forcibly aborted or sterilized wives.

The majority also defends its rule by saying that *Matter of C-Y-Z-* is a long-standing precedent left untouched by the Attorney General, that Congress changed the annual cap for affected asylees without questioning *Matter of C-Y-Z-*, that some spouses can be persecuted together in other contexts, and that Congress's goal was to protect couples.

I make no claim that the considerations noted by the majority can never be relevant.  But resort to such factors is only appropriate if the "forced abortion and sterilization" clause, when read in the context of the statute as a whole, is reasonably ambiguous on whether "a person" includes married couples.  Further, I have already explained why the derivative refugee and asylum statutes should control any *automatic* benefit accorded spouses, as this is the long-standing statutory basis for providing benefits to spouses who were not themselves the direct recipients of persecution.

The Attorney General's refusal to review *Matter of C-Y-Z-*, moreover, does not justify *our* refusal to confront the text of the statute when we are called upon to do so by both a party and the court remanding this very case to us.  The repeal of the statutory cap for "coercive population control" refugees may well reflect no dissatisfaction with *Matter of C-Y-Z-*.  But it does not contain an express endorsement either.  Indeed, there is precious little in *Matter of C-Y-Z-* to endorse, other than a bottom line, perhaps, given that the decision itself fails to contain any statutory analysis for Congress to accept or reject.  It gives no guidance on how to address "boyfriend" cases, such as the one presently before us, let alone "traditional marriage" or divorce cases.  Most importantly, if the actual statute does not support the result in *Matter of C-Y-Z-*, we simply have no authority to amend the statute just because the Attorney General and Congress have failed to object.

The majority's discussion of legislative history may also be incomplete;  it cites to case law construing that history rather than directly to the history itself.  The DHS in its appeal brief, on the other hand, cites directly to portions of that history in arguing that Congress was focused on women, not on men, when it came to forced abortions.  *E.g., Coercive Population Control in China: Hearings before the Subcomm. on Int'l Operations & Human Rights of the House Comm. on Int'l Relations,* 104th Cong. 1 (1995) (statement of Rep. Christopher Smith).  I find it unnecessary to join this battle, beyond noting that the statute, when read in context, is sufficiently clear as to the

---

[1]  Derivative status would also be unavailable for those aliens who only qualify for withholding of removal, given the lack of derivative eligibility in that context.

meaning of "a person" and that nothing in the legislative history reflects a "'clearly expressed legislative intention,' contrary to [the statutory] language, which would require us to question the strong presumption that Congress expresses its intent through the language it chooses." *INS v. Cardoza-Fonseca*, *supra*, at 432 n.12 (quoting *United States v. James*, 478 U.S. 597, 606 (1986)).

The fundamental flaw in the majority's approach–its failure to analyze precise statutory text–is further illustrated in its treatment of "boyfriends, fiancés, and other unmarried partners." Relying on its construct of family entity persecution, the majority crafts a rule that treats a father as "a person who has been forced to abort a pregnancy" if the father is both legally married to the woman who was forced to undergo such a procedure and if the father opposed the abortion. The majority never explains, however, how a father ceases to be "a person" forced to abort a pregnancy when it comes to unmarried partners. Instead, the majority advances a series of policy reasons for "drawing the line at marriage," *Matter of S-L-L-*, *supra*, at 9, and for refusing to extend to a boyfriend or fiancé "the nexus and level of harm" it attributes to a husband. *Id.* Its policy explanations are not without reason. But its entire discussion is only necessary because of the underlying rule it invents in the first place.

The majority's creation of, and restrictions on, its rule of family entity persecution would appear to resolve the cases of most married couples, "traditionally" married couples, and never married couples. But, I see no clear answer emerging as to divorced couples. Does the rule apply if a forced abortion or sterilization took place before the divorce, even if the husband now has children with his second wife? Does it apply if the divorce preceded a forced abortion or sterilization, even if it was the husband's child that was aborted? In this respect, does a father suffer "family entity" persecution if China recognizes a divorce that extinguishes that very entity before it even learns the woman is carrying the father's child?

For the reasons set forth earlier, I agree with the DHS that the statute does not permit the spouse of "a person forced to abort a pregnancy" to establish refugee status in his own right simply by virtue of the marital relationship. Instead, "a person" who has not suffered, or who will not and has not been placed in jeopardy of suffering, a forcible abortion or sterilization procedure can qualify for this sort of refugee status only if he proves that he was persecuted, or has a well-founded fear of future persecution, "for other resistance to a coercive population control program."

As DHS also persuasively argues, the word "for" in the "other resistance" clause means "because of," such that this resistance is the reason why the persecution is inflicted or feared. Thus, if the Chinese Government would forcibly abort a woman regardless of the views or actions of her husband, it

19

may become difficult for the husband to show that the abortion was because of his resistance.

A coercive abortion that is performed against a woman in simple pursuance of the population control policy, and that would have been performed in any event, would qualify as persecution of the woman upon whom it is performed under the plain language of the statute. But, it would not automatically qualify as persecution of her husband or boyfriend, even if he adamantly resisted it and was emotionally harmed by it, unless he can show that it was motivated by (i.e., was "for") his resistance. However, a person who is imprisoned or whose livelihood is lost through governmental action or who is subjected to other forms of economic detriment or physical harm could qualify for refugee status under the "other resistance" clause if these injuries were sufficiently severe and were motivated by his acts or statements in opposition to the coercive population control program, or to its enforcement in a particular case.

The majority evidently reaches the same result on this point in relation to unmarried partners. It declares that "[m]erely impregnating one's girlfriend does not constitute an act of resistance" as "a pregnancy may have been unplanned or even unwanted." *Matter of S-L-L-*, *supra*, at 11. In some cases, however, I think a planned pregnancy could well be viewed as an act of "resistance." The question then becomes the motivation for any termination of that pregnancy, that is, did the Chinese Government intend the forced abortion to be a measure of harm to the father because of *his* resistance. Some of the points made by the majority may support a husband's claim under the "other resistance" clause, at least to the extent that China deems both parties to a marriage to share birth control responsibilities. We do not now face the claim of a husband, however, and are only required by the Second Circuit's remand to explain why spouses may (or, in my opinion, may not) automatically qualify for relief without being direct victims of forced abortions or sterilizations, and then to address the scope of the statute in relation to a boyfriend.

In the latter respect, the respondent presently before us does not qualify. He has not been forced to abort a pregnancy or to undergo involuntary sterilization and has not disobeyed a governmental command that he do so; he has no well-founded fear that either an abortion or sterilization procedure will be performed on him in the future; and he has adduced no evidence that he offered discernible "resistance" to the enforcement of the coercive population control program in general, or to its enforcement against his former girlfriend, who remains in China. Accordingly, even if his girlfriend's involuntary abortion was perceived as a grievous loss by him, it was not persecution inflicted because of his resistance to the coercive population control program.

Moreover, he has not shown that any mistreatment he fears upon return to China would be "for" such resistance.

Turning now to Board Member Pauley's concurring opinion, I note that he acknowledges that the joint spousal persecution theory underlying *Matter of C-Y-Z-*, *supra*, has no basis in the statutory language, but he nonetheless justifies adherence to that theory on grounds of stare decisis. Respect for prior decisions is an important consideration. But Board Member Pauley's view would elevate stare decisis to the power to rewrite the law, simply because the parties once agreed and we published that agreement. The Board is an administrative body. Our precedents are subject to the legal rulings of the Attorney General and the courts.

The Second Circuit has asked us to explain the statutory grounding for *Matter of C-Y-Z-*, *supra*, in this case. It is no answer that our precedent lacks any such grounding, but we adhere to it anyway because we announced it nearly 10 years ago. And I fail to see any justifiable reliance on our precedent by males in China who come to the United States without their forcibly aborted wives, often through costly and dangerous smuggling schemes. In these circumstances, stare decisis is an insufficient basis for defending our rule as against the law enacted by Congress, and conforming to that law is surely a sound reason for departing from past precedent. In short, we have no authority to invent our own version of the law.[2]

In sum, the "joint spousal persecution" or "stand in the shoes" theory has no basis in the text of the statute, and we should repudiate it. Males lacking their own sterilization claims can independently qualify only under the "other resistance" clause, if at all. Otherwise, husbands are fully entitled to pursue derivative status based on any refugee determinations accorded their wives. I agree with the majority's ultimate ruling that the respondent has not demonstrated that he was persecuted in the past for his "resistance" to the Chinese coercive population control program or that he has a well-founded fear that he will be persecuted for such resistance in the future. The majority thus correctly dismisses the appeal, but it seriously errs in perpetuating a rule that finds no support in the text of the law.

---

[2] We are not now concerned with reopening past cases. Instead, as I see it, we must decide whether to continue dispensing an automatic benefit not authorized by law and, if so, whether to extend that same unauthorized automatic benefit to an additional category of persons not covered by the statute. Attempting to draw lines between categories of ineligible applicants is a precarious business, assuming it can ever be justified.